Robert Wayne BIGGERSTAFF, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–15919.

Court of Criminal Appeals of Oklahoma.

Nov. 29, 1971.

Bay, Hamilton, Renegar & Lees, H. A. Leatherman, Oklahoma City, for plaintiff in error.

Larry Derryberry, Atty. Gen., Fred H. Anderson, Asst. Atty. Gen., for defendant in error.

BRETT, Judge:

Plaintiff in Error, Robert Wayne Biggerstaff, hereafter referred to as defendant, as he appeared in the trial court, was tried and convicted by a jury in the District Court of Oklahoma County, Oklahoma, case number 35215, for the crime of Murder. The jury returned a verdict assessing defendant's punishment at life imprisonment, and on March 28, 1969, the court imposed judgment and sentence in accordance with the jury's verdict. From that judgment and sentence this appeal has been perfected. Defendant's first attempt to appeal was dismissed by this Court because the appeal had not been perfected in accordance with the rules of this Court, providing for the manner and means of perfecting an appeal. That attempt to appeal was No. A–15,557. Thereafter defendant was granted an appeal out of time, which is now being considered.

Defendant was charged with having caused the death of his wife, Jessie Slagle Biggerstaff, on November 26, 1968. The information alleged that defendant choked his wife to death on the morning of November 26th. Defendant was arrested about 10:00 o'clock that evening after which he was taken to the city jail. On the following day defendant allegedly signed a voluntary statement in which he allegedly admitted having committed the crime. The admission into evidence of this statement is cited as one of the errors committed during his trial. The second proposition argued by defendant in his supplemental brief, filed by counsel of his own choosing, complains concerning the trial court's instruction number four, in which it is asserted the trial court stopped short in stating the law concerning intoxication.

Defendant testified in his own behalf and related that on November 25, 1968, he and his wife returned from Amarillo, Texas, arriving at their home in Oklahoma City at approximately 6:00 P.M. He related that they had both been drinking and that he was drunk at the time of returning to the apartment. He testified that he went into the bedroom and laid down on the bed, passed out and awoke again at about 11:00 P.M., when he discovered his wife was gone. He said that he sat around and drank until about 3:00 A.M. on the morning of November 26th, when his wife returned to the apartment. He testified that his wife decided to take a bath because she was going to work at 7:00 A.M. that morning. He said when she finished bathing she couldn't get out of the bathtub, so defendant helped her out of the tub; she then fell in the kitchen and defendant proceeded to help her to the bed. Defendant testified this happened about 4:30 or 5:00 A.M. According to defendant's story, he had observed the bruises on her face when she came in at 3:00 A.M. that morning, and in response to his questions, she said that a man by the name of Lewis caused the bruises. He related that about 4:00 or 5:00 A.M. he called his brother, Harold Biggerstaff, in Oklahoma City, and told him that something was wrong with Jessie and asked him to come over and help him, but his brother refused to do so. About an hour later he called his sister in North Canton, Ohio, and related essentially the same information to her. He testified further that about 7:30 on the morning of November 26th, he went to get some beer; then he went back to his apartment and stayed until about 8:00 A.M., when he went out to get some more beer, which they both drank. He said he had to keep an appoint-

ment with a friend at Fifteenth Street and North Central Street, and about 9:15 A.M. he went to see Mr. Floyd Nickerson, but he wasn't there; so he visited his aunt who lived on Southwest Twenty-Third Street; and at about 10:00 A.M. he went to a liquor store to get a bottle of liquor and then went back to his apartment. He related that when he arrived at the apartment his wife was in bed; that they had a couple of drinks; he cooked some bacon and eggs, which they both ate; and he then left the apartment again to go to the post office in Capitol Hill. He continued that about noon he went to a beer joint on Southwest Twenty-Fifth Street; and from there he went to 1400 Southeast Twenty-Ninth Street to the Budget Auto Sales, where he stayed and looked at cars until about 6:30 or 7:00 that evening. When he left the auto sales, one of the salesmen drove the car; he went to the Holiday Inn on Interstate 35 and had two drinks; that he then returned to the apartment and discovered his wife lying on the floor without any clothing on. He said he thought she was just drunk and put a pillow under her head and a blanket over her; and that he fooled around, had a few more drinks and the next thing he knew the policeman was looking at him. In his testimony, defendant specifically denied that he caused the death of his wife. He asserted that he was drunk when they arrived home, that he drank more during the night, and that he had drunk considerable liquor the following day. According to defendant's testimony he slapped his wife only one time, about 10:00 the morning of November 27th, when she threw the portable television at him.

The only testimony offered by the defendant was that of the defendant himself. He did not produce the man "Lewis," who he said beat-up his wife; nor did he produce Mr. Floyd Nickerson, with whom he claimed to have had an appointment.

To support the charge of murder against the defendant, the first witness offered by the State was Harold M. Biggerstaff, defendant's brother. On direct examination this witness testified that about 4:00 A.M. on November 26, 1968, the defendant called him on the telephone. When the prosecutor asked the witness to state what his brother said to him on the telephone, the witness replied, "He said, I believe, now—I was pretty well sleepy, but, I don't know much about it, I can tell you about what he said. 'I believe Jess is dead. Will you come over?'" He identified "Jess" as being defendant's wife, Jessie. Defendant's brother testified that he did not go over to defendant's apartment that night, but he did go later that evening, after he received a second telephone call from his sister in Canton, Ohio. At his request, about 10:00 P.M., an Oklahoma City Police Officer met the witness at a laundromat near the defendant's apartment and they proceeded together to the apartment. He related that when they reached the upstairs garage apartment he proceeded up the stairway, knocked on the door and when there was no response he took hold of the doorknob and opened the door. He related that he saw his brother laying in bed and saw defendant's wife lying on the floor; however, he did not enter the apartment.

On cross-examination this witness related that he is four years older than defendant. He stated that the reason he did not respond to defendant's telephone call at 4:00 A.M., was because the defendant was pretty much of a drinker and frequently made foolish calls to him; and he thought this was another foolish telephone call. He testified also that defendant was drunk every time he had seen him during the last ten (10) years; and that defendant was drunk when he and the officer reached the apartment. This witness went to the police car and 15 or 20 minutes later the officers brought the defendant down and put him in the car with the witness. He related that the defendant had been in the Dallas Veteran's Hospital as a result of an automobile accident; that defendant's leg had been broken and he lost one eye in the accident. He related that he rode to the police station with defendant and they arrived there about 11:00

# 349

P.M., and by that time defendant was beginning to sober up.

The next witness offered by the State was Officer Ron McEwen, a homicide detective with the Oklahoma City Police Department. He related that he and his partner, Officer Bill Hooten, interrogated the defendant at the City Jail at approximately 9:00 A.M. on November 27th. Defendant objected to this witness testifying concerning the alleged voluntary statement rendered by defendant. The Court then recessed and outside the hearing of the jury held an evidentiary hearing for the purpose of determining the admissibility of the confession, or statement, rendered by defendant. At the conclusion of the hearing the court found that the statement was admissible into evidence, and the trial proceeded in the presence of the jury.

When the trial proceeded in the courtroom, the defendant again objected to the introduction of the defendant's confession. The objection was overruled and defendant was allowed his exceptions. The prosecutor asked the officer if he had advised defendant of his rights, and the witness replied, "I advised him that he didn't have to talk to us at all, that anything he did say could be used later on in a court of law against him, and that he was entitled to an attorney at any time, and that if he could not afford an attorney, one would be appointed by the State for him." The officer testified also that he believed defendant understood this explanation of his rights.

The third witness offered by the State was Police Officer Jerry Canary, the officer who met defendant's brother at the laundromat and went to the apartment with him. The officer testified that he saw defendant sitting up in bed with the sheets, pillows and everything removed off the mattress and saw defendant's wife lying on her back on the floor. When he asked defendant what the trouble was, the defendant replied that his wife was drunk and that she would be alright after awhile; however, he related that he could

tell that defendant's wife had been dead for several hours. The officer related that he called the robbery-homicide division and asked that they send a lab man to the scene; and that Officer Burke was the technical investigator who took pictures of the scene. On cross-examination the officer related that the defendant was drunk, when he and defendant's brother arrived at the apartment. This witness also identified the photographs of the deceased woman introduced as State's Exhibits 1, 2 and 3. The exhibits were admitted into evidence over defendant's objection.

The next witness was Crime Laboratory Officer W. T. Burke, who took the photographs which were introduced into evidence. He identified Exhibit No. 4 as being a photograph he took of the deceased woman lying on the hospital table at University Hospital. This photograph showed deceased's nude body from a point just below the naval upward. Exhibit No. 4 was admitted over defendant's objection. Defendant objects to this photograph as being the type prohibited in Oxendine v. State, Okl.Cr., 335 P.2d 940 (1958). As we view the photograph, it showed the extensive nature of the bruises on the deceased's upper torso, and was not so prejudicial as defendant claims. On cross-examination Officer Burke testified he found a small table-size television set, with a picture screen of approximately 12"; that it did not appear to be broken, but that it would not operate when he tried to turn it on.

The next witness was Dr. Larry W. Cartmell, who performed the autopsy on the deceased woman's body. Dr. Cartmell testified that the deceased woman had bruises about the face, on the top of her head and on her arm, and that there was a fracture of the thyroid cartilage, commonly referred to as the adams apple. He related further that when the thyroid cartilage was fractured the woman died of asphyxia, which resulted from strangulation. He stated his opinion also that it would be impossible for a person to fall

across a bathtub or on a floor and fracture that cartilage. He related that the bruises were caused not more than 24 hours prior to the finding of the deceased's body. He related also that it was his opinion the deceased died as a result of manual strangulation.

When the State rested its case, the defendant testified as set forth in the beginning. No other testimony was offered and the defense rested. The State offered testimony of Detective Bill Hooten as a rebuttal witness. His testimony concerned the taking of defendant's statement.

In response to the Attorney General's application for an extension of time to brief this appeal, the defendant filed, pro se, an instrument in opposition to that application and prayed for reversal of his conviction. We hereby deny defendant's pro se motion to reverse, and consider the appeal on its merits.

We will discuss first the proposition offered in defendant's supplemental brief filed by counsel, who was not defendant's trial counsel. That proposition is stated: "The trial court committed reversible error by failing to instruct the jury on the theory of his defense and by giving its instruction number 4."

■ At the trial defense counsel offered a requested instruction for the court which intended to instruct on the question of intoxication. The trial court correctly refused to give that instruction and made the notation that the requested instruction was contrary to the statutes. The trial court's position was correct, because intoxication does not excuse responsibility for the commission of a crime. However, the court's instruction number 4, of which defendant complains, defined the term "homicide"; and in the body of the instruction the court instructed the jury concerning the meaning of "design," and then provided:

"* * * Homicide committed with a design to effect death is not the less murder because the perpetrator was in a state of anger or voluntary intoxication."

Following that statement the instruction contained the definition of manslaughter in the first degree.

Defendant's argument under this proposition asserts that the court's instructions failed to instruct on defendant's theory of defense. That theory was, that defendant was intoxicated to the point where he could not have formulated the specific intent required to commit the crime of murder. The brief sets forth the requested instruction and states the following: "Now, we do not suggest that this instruction necessarily contains a correct statement of the law as it now prevails in this State. But, it cannot be said that it does not focus attention on the theory of the defendant's case." Counsel then sets forth that the only comment in the entire set of instructions concerning defendant's state of drunkenness was the court's brief reference contained in instruction number 4. That part of the court's instruction was taken from 21 O.S.1961, § 153, which reads:

"No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition."

■ After reviewing the court's instructions in their entirety, we conclude that defendant is correct. Absent the total consideration of intoxication, the jury had no other tangible reason to consider and was left no alternative but to find the defendant guilty of murder. We therefore conclude that defendant's objection is correct; and under the facts of this case such error will warrant modification of the judgment and sentence herein.

"A person who commits a homicide while so drunk as to be incapable of forming a premeditated design to kill, if he had formed no purpose to commit the crime prior to the time he became so intoxicated, is not guilty of murder, but is guilty of manslaughter in the first degree." Beshirs v. State, 14 Okl.Cr. 578, 174 P. 577 (1918).

"Where an unlawful homicide is established, and alleged to have been committed with a premeditated design to effect death, and it appears that the person charged was in such a state of voluntary intoxication as to preclude a premeditated design or intent to take human life, the offense is reduced from murder to manslaughter in the first degree." Choate v. State, 19 Okl.Cr. 169, 197 P. 1060 (1921).

The State, by its own witnesses, proved defendant's propensity for drinking; and the fact that he was drunk when he was arrested. By the same token, there is nothing in the record to refute defendant's own testimony that he and his wife had been drinking for several days, and that he thought his wife was only drunk. The only question left unanswered is, how drunk the defendant actually was, at the time of the incident; and could he have formulated the specific intent required to commit the crime of murder. Under the court's instructions these questions were not considered by the jury.

In Oxendine v. State, Supra, a similar complaint existed in which the defendant asserted the court's instruction was improper, and this Court provided an approved instruction covering the question of intoxication in cases wherein intoxication was one of the defenses offered, as follows:

"You are instructed that homicide committed with a design to effect death is not the less murder because the perpetrator was in a state of voluntary intoxication at the time. However, one of the elements of the crime of murder is an intent to effect the death of the person killed and if you find that the defendant at the time of the killing was so completely drunk as to be totally unable to form an intent to kill, or if you have a reasonable doubt thereof, you should not find the defendant guilty of murder. The homicide, under such circumstances, unless otherwise excusable, would amount to manslaughter in the first degree." at page 944 of 335 P.2d.

We must therefore conclude that defendant's complaint is well taken; and the court's instruction 4 did stop short of stating the law concerning intoxication as a mitigating circumstance.

█ Defendant's other complaint concerns the confession admitted into evidence over his objection. Defendant was booked into the City Jail about 11:00 P.M. on the evening of November 26, 1968; and about 9:00 the next morning Police Officers McEwen and Hooten questioned him in his jail cell. At the time defendant did not have his glasses; and he testified that he could not see either man well enough to identify who questioned him; and that he had a "bad hang-over." The officers related that defendant told one story and later indicated that he wanted to tell the truth and related the substance of what was contained in the statement introduced into evidence. About 1:30 P.M. on the same day the officers took defendant to the robbery-homicide division of the police department, where the typewritten statement was made and defendant allegedly signed it voluntarily. At that time Officer McEwen had obtained defendant's glasses from the property room and he could see to execute his signature, which he admitted. The statement was typed by a secretary as defendant allegedly related answers to the questions asked him. The crux of defendant's complaint in this appeal is, that the officers did not properly admonish the defendant prior to questioning him and therefore his constitutional rights were not knowingly and intelligently waived.

On direct examination the prosecutor asked Officer McEwen to tell what rights he advised the defendant before the interrogation was commenced; the officer answered:

"I advised him that he didn't have to talk to us at all, that anything he did say could be used later on in a Court of Law against him, and that he was entitled to an attorney *at any time,* and that if he could not afford an attorney,

one would be appointed by the state for him." (Emphasis added.)

We observe also the trial court's instruction number 5, covering the jury's consideration of the confession admitted into evidence reads, in part, as follows:

"A 'Voluntary Confession' is a statement made by an accused while in custody, and as a result of interrogation, that is questioning, by the officers, *and after having been informed by them that he has a right to consult with a lawyer, and to have the lawyer with him during the interrogation,* and also after having been warned of his right to remain silent, and that anything said by him can be used in evidence against him, and thereafter, with full understanding of his rights and of the nature and consequences of his statements, he freely and voluntarily admits he is guilty of the crime, and reveals the details of it, or what he had to do with it." (Emphasis added.)

Nowhere in the record is there any indication that the officers advised defendant that he was entitled to have an attorney present during the period of interrogation.

In the case of Atwell v. United States, 398 F.2d 507, 510 (5th Cir. 1968), the Court of Appeals held with reference to the warnings required in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966):

" 'At anytime,' in its usually accepted connotation in ordinary everyday affairs, can be said to embrace the full span of any course of events. But dealing with the Constitutional rights of an accused at the preliminary stage of the in-custody interrogation process is not commonplaced. 'Anytime' could be interpreted by an accused, in an atmosphere of pressure from the glare of the law enforcer and his authority, to refer to an impending trial or some time or

event other than the moment the advice was given and the interrogation following.

\*   \*   \*   \*   \*   \*

"The advice that the accused was entitled to consult with an attorney, retained or appointed, 'at anytime' does not comply with Miranda's directive '\* \* \* that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation \* \* \*. Only through such a warning is there ascertainable assurance that the accused was aware of this right.' " [Citations Omitted]

We therefore hold that the use of the phrase "at any time," while referring to the accused person's right to the assistance of counsel, i. e., "the accused is entitled to an attorney at any time," is not sufficient to meet the requirements of Miranda v. Arizona, supra. Therefore, it was error to admit the alleged confession in evidence at defendant's trial, in this case.

■ Absent the defendant's confession, the evidence herein is not sufficient to sustain a conviction for the crime of murder. Therefore, it becomes necessary to consider the evidence produced by the State to determine if it was sufficient to sustain a conviction for the crime of First Degree Manslaughter. We believe that it was, if believed by the jury, sufficient to sustain that charge.

By his own testimony defendant admitted that he was drunk and had been drunk for several days; that he continued his drinking during the period of time herein concerned. He admitted that he had an argument with his deceased wife, and that he struck her at least one time. He asserted that he could not remember certain happenings that occurred during the time period herein concerned; and he admitted that he telephoned his brother about 4:00

A.M. that morning, but denied that he said what his brother related, "I believe Jess is dead. Will you come over?" But, if defendant was as drunk as he asserted, it is doubtful that he would have remembered the exact words he stated. And allowing also, that the defendant was intoxicated to the extent that he could not formulate the specific intent required to commit Murder—a fact which the Attorney General denies in his brief because the defendant remembered and related too many details—he was the only person shown to have been in the position to have caused the death of his wife. Certainly the evidence and testimony produced by the State was sufficient to show that the defendant caused his wife's death, whether intentionally or not.

There is also little doubt in our minds that had the trial court's instruction contained the mitigating effect of intoxication, with reference to the element of specific intent, the jury would have returned a verdict finding defendant guilty of first degree manslaughter, instead of the murder charge. Consequently, we reach the conclusion that a retrial of this case on the same evidence without the confession would result in a manslaughter conviction.

We are therefore of the opinion, under authority of 22 O.S.1961, § 1066, that the proper administration of justice requires that the judgment and sentence herein should be modified from a conviction for the crime of Murder, with sentence of life imprisonment, to a conviction for First Degree Manslaughter with sentence of fifteen (15) years imprisonment, and as modified the same should be affirmed.

It is therefore ordered that the judgment and sentence in District Court of Oklahoma County, Oklahoma, case number 35215, is hereby modified to conviction for First Degree Manslaughter, and defendant is sentenced to serve fifteen (15) years

imprisonment. The Department of Corrections is directed to correct defendant's prison records to reflect such modification.

BUSSEY, P. J., concurs in result.