THE STATE OF OHIO, APPELLEE, *v.* BLANTON, APPELLANT.*

(No. 760—Decided February 11, 1960.)

*Mr. Harold D. Spears*, prosecuting attorney, for appellee.
*Messrs. Gorman, Davis & Hengelbrok* and *Messrs. Riley & Riley*, for appellant.

RADCLIFF, J. This appeal is from the verdict and sentence of a three-judge court finding Warnie Blanton guilty of manslaughter in the first degree. Warnie Blanton was indicted for second degree murder by the January 1959 grand jury of Lawrence County, Ohio. He was charged with unlawfully, purposely and maliciously killing William Kenneth Hall on the 8th of December 1958. To the indictment, the defendant entered a plea of not guilty, waived a jury and requested trial by a three-judge court. Trial was had before a three-judge court and resulted in a finding of guilty of the lesser included offense of manslaughter in the first degree. Blanton was sentenced to the

---

*Motion for leave to appeal overruled, May 18, 1960.

Ohio Penitentiary for a period of not less than one year nor more than twenty years. Supersedeas was granted by this court after the appeal was perfected.

The facts are in dispute on nearly every point. This is shown by the conflict in the testimony of the witnesses who appeared on behalf of the state of Ohio and those who appeared on behalf of the defendant. The defendant, appellant herein, testified in his own behalf. Even though the facts are in dispute, we must endeavor to make some resume of them in order to pass upon the assignments of error raised by the defendant.

The principals in this case are William Kenneth Hall, the deceased, who was 44 years old at the time of his death on December 8, 1958. He married Ada Howard Huff Hall in 1955. They were divorced in July 1958 and remarried in November of 1958. Ada Howard Huff Hall was 41 years of age at the time of the shooting. She had been married to a man by the name of Huff. Several children were born to Ada Huff during that marriage. There were no children born to the Halls during either of their marriages. Mrs. Hall was the daughter of John and Julia Howard and the niece of Lucy Caudill at whose home the shooting, resulting in the death of her husband, occurred. Warnie Blanton was 59 years of age, married, and the father of eight children. He resided in Phoenix, Arizona, at the time of the shooting.

All three of the principals have lived in or near Ashland, Kentucky, a greater part of their lives. Hall was a construction worker and spent a great deal of his time away from his home in the Ashland-Ironton area. Blanton was a former member of the police force in the city of Ashland, Kentucky. Though now a resident of Phoenix, Arizona, he had engaged in the real estate business in the "tri-state area" for the past three years. He also arranged auction sales and dealt in livestock as well as residential and farm real estate. In 1957, Mr. and Mrs. Hall become associated with Blanton in some business transactions. Blanton was also a very good friend of John and Julia Howard, the parents of Ada Hall. They had been friends for at least forty years. He had known Ada Hall from the time of her birth. At the time Mr. and Mrs. Hall become associated with Blanton in these business transactions there was apparently a feeling

of friendship on the part of all of them. However, while Hall was away from home, Mrs. Hall become more active in the commercial field with Blanton, and they were together more and more. Then Hall's attitude changed. In April 1958, Hall evidenced jealousy of his wife and a feeling of extreme distaste for Blanton. On April 23, 1958, Hall filed suit for divorce in the Common Pleas Court of Lawrence County, and in his petition named Warnie Blanton as the corespondent, charging that an open and notorious association existed between Mrs. Hall and Warnie Blanton. This suit was dismissed. On April 26th, Mrs. Hall filed suit for divorce, charging gross neglect of duty against her husband. The divorce was granted on July 30, 1958, and a separation agreement previously entered into on April 7, 1958, was ratified by the court. Mrs. Hall was restored to her former name of Ada Huff. Blanton testified that he did not know that Hall had ever sued Mrs. Hall for a divorce or that he was named as corespondent until after the shooting on December 8th. He did know, however, of Mrs. Hall's divorce proceedings, because the first check written by Blanton to Mrs. Hall after July 30th was drawn to Ada Huff while the last check issued prior to July 30 was drawn to Ada Hall. The checks were exhibits of the defendant.

During the time of the trouble in April 1958, William Kenneth Hall procured and kept in his possession a revolver. In July of 1958, before the Halls were divorced, Blanton testified that certain threats toward him, made by Hall, had been communicated to him. One day, he saw Mr. and Mrs. Hall together, and Mr. Hall appeared to be quite pale and agitated. Mrs. Hall had him by the arm. and as they passed near him he saw the outline of a gun in Hall's pocket. No words were spoken between the parties at that time. Immediately Blanton procured a revolver from a police officer friend of his in Ashland and carried it with him at all times thereafter. It was this weapon that fired the fatal shot on December 8th. Blanton described the relationship between Mrs. Hall and himself as being a purely commercial arrangement that was advantageous economically to both of them. He described Mrs. Hall as a "bird dog" who would contact prospects that had property to buy or sell. He stated that she was an excellent judge of values of

both real and personal property and that he paid her substantial commissions.

Shortly before Mr. and Mrs. Hall were remarried, Blanton and the then Mrs. Huff entered into negotiations for the purchase by Mrs. Huff of a house owned and occupied by Blanton. A part of these negotiations were carried on at the home of Lucy Caudill, the aunt of the then Mrs. Huff, where the fatal incident took place. On at least one occasion in October or November, pending the purchase of the house and small farm by the then Mrs. Huff, Blanton and Mrs. Huff spent the night at the home of Lucy Caudill. Finally, the transaction was completed. The Halls were remarried and re-established their home in the property which Mrs. Hall had purchased from Blanton. It was located some three miles from the house occupied by Lucy Caudill.

On December 8, 1958, Blanton, preparing to leave the "tristate area" and go to his home in Phoenix, Arizona, for the holidays, drove from Ashland, Kentucky, to the home of Lucy Caudill on Solida Road, arriving there sometime between 2 and 3 p. m. The purpose of the trip was to deliver a message to Mrs. Caudill, to say goodbye to her pending his departure for Arizona and to get some pickled beans that Mrs. Caudill had prepared for him. While there Mrs. Hall drove up to the house of Lucy Caudill and all three visited for some period of time. Both Mrs. Hall and Blanton drove light tan or white Cadillac automobiles. Blanton then left the house, drove a few hundred yards, turned around and came back. He had forgotten to get the food that Mrs. Caudill had prepared for him. He came back to the house. Then, Mrs. Caudill left the house ostensibly to get the pickled beans which were stored in an outbuilding, but seeing her cow wandering away, followed the cow to bring her back to the lot. Blanton and Mrs. Hall were in the Caudill home during this time. At about 3:20 or 3:30, William Kenneth Hall drove up in front of the Caudill home and parked his car on the wrong side of Solida Road. He approached the side door of the Caudill home and was heard to say, "I am going to kill the s. o. b.," as he walked toward the house. Blanton stated he was not aware of the presence of William Kenneth Hall until he opened the side door of the Caudill house

as he was leaving, still without the pickled beans.  There, he was faced by Hall, gun in hand.  He claimed he heard him make the remark above quoted.  Three shots were fired, one by Hall. This bullet passed through the wooden frame of the screen door, the door proper and the door frame.  Then it entered the right-hand pocket of Blanton's topcoat, penetrated the leather cover of his keycase and struck one of the keys in the keycase.  It then fell to the floor.  Blanton contended that he did not know of Hall's presence until he opened the door.  He also contended that his gun was in his right-hand coat pocket and that he drew it and fired two shots.  The bullet first fired by Blanton passed through the frame of the door and through the copper screen of the screen door.  It did not strike Hall, and as yet has not been found.  The second bullet fired by Blanton passed through no wood or metal and struck Hall above the right eye, about one inch from the mid-forehead; it passed almost through Hall's head.  Hall fell backward and lay groaning and retching at the side of the Caudill house his feet upon the small step leading to the side door and his body on the ground.  Blanton went outside, backed his car onto Solida Road so that Mrs. Hall could get her car out of the drive.  Mrs. Hall then left.  Blanton pulled his car back into the drive and a neighbor coming over to investigate the shooting was asked by Blanton to call an ambulance and the Highway Patrol.  The ambulance came, Hall was taken to a hospital and pronounced dead some five minutes after arrival.  He did not regain consciousness and uttered no intelligible sound after being struck by the bullet.  Blanton freely admitted shooting William Kenneth Hall and said that he did it in self defense.  When he voluntarily appeared before the grand jury he again admitted the shooting, saying that he was exercising his right of self defense.  Trial was had with the result herein before set forth.

This resume of the facts is at best sketchy, for the record is voluminous, and at times the situations involving the deceased and the accused are quite complicated.  It is felt that it is sufficient, but it may become necessary to include more of the testimony as we proceed to dispose of the errors assigned by the defendant, Warnie Blanton.

The assignments of error are as follows:

1. The entire theory of the prosecuting attorney was not based on the law.

2. The court improperly admitted evidence over the objections of the defendant.

3. The court denied the right of the defendant to sur-rebuttal.

4. The court refused to permit the taking of the deposition of Ada Hall.

5. The judgment was manifestly against the weight of the evidence.

It is the contention of the defendant that the theory under which this case was tried on the part of the state of Ohio was tantamount to writing the "unwritten law" into the law of Ohio; namely that an aggrieved husband has the right to repel with force the welcome or unwelcome attention of a third party toward his spouse, and that the third party, before he is entitled to the right of self defense, must retreat to the wall.

The doctrine of *se defendendo* has been in the English law since 1320. It is the theory by which homicide is either justified or excused. Ancient though the doctrine is, it was not until 1876 that Judge George W. McIlvaine of the Supreme Court of Ohio, in a case arising in Gallia County, clearly defined and refined the doctrine to be as we understand it today. His definition has been adopted and accepted in many other jurisdictions. Judge McIlvaine was quoted at great length by Mr. Justice Harlan of the United States Supreme Court in the case of *Beard* v. *United States*, 158 U. S., 550, 560 and 561, 39 L. Ed., 1086, 15 S. Ct., 962. In *Erwin* v. *State*, 29 Ohio St., 186, 199, 23 Am. Rep., 733, Judge McIlvaine summarized the law of self-defense as:

"The law, out of tenderness for human life and the frailties of human nature, will not permit the taking of it to repel a mere trespass, or even to save life, where the assault is provoked; but a true man, who is without fault, is not obliged to fly from an assailant, who, by violence or surprise, maliciously seeks to take his life or do him enormous bodily harm."

This is the law of self-defense in this state. With it we must also consider the cases of *Marts* v. *State*, 26 Ohio St., 162; *Stoffer* v. *State*, 15 Ohio St., 47, 86 Am. Dec., 470; *Napier* v.

*State*, 90 Ohio St., 276, 107 N. E., 535; and *Graham* v. *State*, 98 Ohio St., 77, 120 N. E., 232, 18 A. L. R., 1272, covering certain other aspects, such as retreat, mutual combat, provocation and necessity.

This cause being tried to a three-judge court does not reveal the theory of law under which the facts were submitted to the triers of the facts, as there is no charge to the jury. The three judges had to decide both the questions of fact and law. This record of trial cannot disclose the theory upon which the court reached its decision. There is nothing to indicate that the "unwritten law" was embraced by this court in deciding any' question of fact. It could well be, because of the direct conflict in the testimony of the witnesses on all important points, that the judges felt that Warnie Blanton did not meet the standards of "a true man." It could well be that the trial judges felt that Warnie Blanton was the aggressor in the events that led up to the tragic climax on December 8, 1958. This court may well have considered this affray the result of an agreement to finally settle the differences of these men. They could have found, and there is evidence to support it, if the triers of the facts regarded it as credible, that the necessity of the situation did not require the means used or the fatal result caused by the accused's action.

The facts that could have been deduced from a close examination of the screen door, the door and the door frame as it stood before that court during the entire trial, are many and varied. The opinions expressed by Professor Nicoll, the ballistic expert and criminologist, who testified concerning the door, did not in any way foreclose the reaching of far different conclusions that are just as logical and just as forceful as his. There is nothing in this record to indicate that the so-called "unwritten law" rule enunicated in *State* v. *Martin*, 9 O. D., 778, and *Martin* v. *State*, 17 C. C., 406, 9 C. D., 621, ever was a factor in the deliberations or the conclusions reached by the triers of these facts.

The question to be decided by the three-judge court was one of fact, not one of law. The legal principles are plain, but only those who heard and saw the witnesses and examined the exhibits firsthand are in a position to say with certainty what the facts were on December 8, 1958.

These facts having been determined, there is no way in which we may properly pry into the method used or theory relied upon to reach the conclusion that was here reached. It would be only idle speculation on our part and an endeavor to substitute our judgment for that of the trial court. This is expressly forbidden by the rules laid down in *Ezell* v. *State*, 119 Ohio St., 39, 162 N. E., 106; *State* v. *Robinson*, 161 Ohio St., 213, 118 N. E. (2d), 517; *State* v. *Robinson*, 162 Ohio St., 486, 124 N. E. (2d), 148; *State* v. *Robinson*, 100 Ohio App., 466, 137 N. E. (2d), 141; and *State* v. *Ray*, 102 Ohio App., 395, 143 N. E. (2d), 484. See, also, *Cross* v. *Ledford*, 161 Ohio St., 469, 120 N. E. (2d), 118; and *In re Tilton*, 161 Ohio St., 571, 120 N. E. (2d), 445. In addition to the cases already cited herein the following authorities have also been examined and found to be helpful: 2 Burdick's Law of Crime, 122, 132; 1 Wharton's Criminal Law and Procedure, 464, 501; 3 Underhill's Criminal Evidence (5 Ed.), 1546 and 1567; 26 American Jurisprudence, 245 and 249, Sections 131 and 137; 27 Ohio Jurisprudence (2d), 629 *et seq.*, Sections 89 to 96.

It follows from what we have said that the first assignment of error is not well taken and consequently is overruled.

The second assignment of error goes to the question of the admission of evidence. It deals principally with the fact that certain statements of the decedent were admitted in evidence, even though not part of the *res gestae* or a dying declaration. Also urged, in support of this assignment of error, was the admitting of evidence as to the alleged misconduct of the defendant and Ada Hall. Further asserted as erroneous were certain improprieties in the admission of evidence that tended to impeach the testimony of a witness for the defendant while the defendant was denied the opportunity to impeach the witnesses whose testimony created that situation.

We must begin with the premise that even though the admission or exclusion of evidence may be erroneous, it does not warrant a reversal unless it is shown to be prejudicial to the defendant or that the improper evidence was relied upon in reaching the conclusion that the triers of the facts did reach. This rule applies generally in all cases that are tried to a jury, and

even there the improper admission or exclusion of evidence may be cured by a proper instruction by the court. In this case there was no jury. The jury was waived and the three judges sat as both judge and jury. This court was not sitting as a court of equity; it was sitting as a court of law, clothed with the authority and responsibility to decide all questions, both fact and law. We wish to point out one of the cases cited by the defendant in his brief, namely, *State* v. *Grayson*, 10 O. D., 221, is improperly cited, it should be 10 O. D., 55, 18 W. L. B., 221. This case has no application to the facts before us but it was examined.

We feel that it may have been improper to admit the declarations made by the deceased to a third person who testified as to them, but certainly this was not prejudicial error. The other facets of the urged error concerning the admission and exclusion of evidence were not erroneous in view of the fact that this case was being tried to a three-judge court at the specific request of the defendant.

The law in Ohio is very clear that the rules as to the admission or exclusion of evidence are different when a case is being tried without a jury or by a three-judge court sitting as both judge and jury. The doctrine had its origin in this court and the language Judge Mauck used in formulating the rule, in his opinion in *Gilbert Grocery Co.* v. *Briggs*, 7 Ohio Law Abs., 445, affirmed by the Supreme Court of Ohio in 121 Ohio St., 25, 166 N. E., 818, has been quoted directly in all leading texts and cases where it applies. *State* v. *Mason*, 85 Ohio App., 186, 83 N. E. (2d), 807; *State* v. *Polhamus*, 62 Ohio Law Abs., 113, 106 N. E. (2d), 646; 39 Ohio Jurisprudence, 1191, Section 448. See, also, *Pustoy* v. *State*, 12 Ohio Law Abs., 560; *Mitchell* v. *New York Life Ins. Co.*, 62 Ohio App., 54, 22 N. E. (2d), 998; *State* v. *Demma*, 161 Ohio St., 54, 117 N. E. (2d), 425; 3 American Jurisprudence, 456 *et seq.*, Section 895 *et seq.*, and 593, Section 1037. Under the circumstances under which this case was tried the error which is asserted concerning the admission of or exclusion of evidence is not well taken and is overruled.

The third assignment of error is predicated upon the fact that the court denied the defendant the right of sur-rebuttal. The order in which criminal cases are tried in Ohio is fixed by

statute, namely Section 2945.10 of the Revised Code. This statute contains no provision for sur-rebuttal or rejoinder testimony, whichever you choose to call it. The rebuttal testimony offered on behalf of the state had for its purpose impeachment. We feel it was offered after laying the proper foundation therefor. It is true that some of the witnesses that appeared and testified in rebuttal were used by the state in chief, but there was no repetition in their testimony and they were only asked the questions that had a bearing upon the impeachment of certain witnesses for the defendant. The only rebuttal testimony heard that was not in direct contradiction to an answer on direct examination had to do with the condition of the brakes on the car of the decedent. It was impossible in that instance, as the testimony toward which it was directed was given in the deposition of Belle Smith. It concerned the manner in which the deceased drove and stopped his car when he approached the home of Lucy Caudill. The foundation was not absolute in form, but had been sketched in.

A broad discretion is given the trial court in permitting the introduction of testimony out of order or permitting either side the right to re-open after it has rested. There was no abuse of that discretionary power in this case, which would have to be shown in order to amount to prejudice. The authorities which are cited in the preceding paragraph as to the admission of evidence before a three-judge court also apply to this assigned error. It is not well taken.

The fourth assignment of error has to do with the deposition of Ada Hall. The request to take her deposition was not made until the time of the argument on defendant's motion for a new trial.

Apparently the defendant has abandoned this assignment of error (see page 16 of the reply brief of the defendant), but we will rule upon it. The request to take the deposition was not made until the case had been concluded and a motion for a new trial had been filed. It seems to us the trial court did all in its power to force the attendance of Mrs. Hall as a witness on behalf of the defendant. Continuances for the purpose of locating her were granted. Officers were sent to neighboring states for the same purpose. There is some indication, perhaps dehors

the record,* that some of the witnesses who testified on behalf of the defendant knew her whereabouts and were in communication with her during the progress of the trial.

Sections 2945.46 and 2945.50 of the Revised Code describe the procedure for forcing attendance of recalcitrant witnesses and for the use of depositions. Both of these sections lodge discretionary power in the court and there certainly is no showing of any abuse of that discretion in this case. The court did all in its power to make Mrs. Hall available as a witness. Consequently, this assignment of error is not well taken.

The fifth assignment of error is that the judgment reached by the three judges herein was against the manifest weight of the evidence. A great deal of what we have written concerning the first assignment of error has application to this assignment. There is no question that the evidence in this case was conflicting on every important point of fact. It is also true that the three judges are the sole judges as to the credibility of the witnesses and the weight that is to be given to the testimony of any of the witnesses. When the court, sitting as both judge and jury, reaches a conclusion that is supported by any substantial evidence, no matter how conflicting, a reviewing court does not have the right to say the conclusion reached is against the manifest weight of the evidence. See *State* v. *Robinson, supra.*

In the brief of the defendant reference is made to a letter written by the deceased on August 31, 1958. This letter was found by the defendant's son at a home formerly occupied by Mrs. Hall, and was admitted in evidence. A careful reading of this exhibit depicts the deceased as a frightened, chastened and forgiving man who admits that he ran to avoid trouble with the defendant. It does not picture him as bent upon taking the law into his own hands by an act of vengence upon the person who, he felt, was his tormentor.

We feel, after a thorough and exhaustive examination and re-examination of the record and the exhibits, that we cannot say the judgment herein appealed from is against the manifest weight of the evidence. In addition to the cases already cited

---

*This appears in a deposition that was offered in evidence, but was neither admitted nor excluded by the trial court. It was attached to the bill of exceptions.

122

we wish to call attention to *State* v. *Neff*, 104 Ohio App., 289, 148 N. E. (2d), 236. The fifth assignment of error is not well taken and is overruled.

The judgment herein appealed from must be and is hereby affirmed. The journal entry submitted pursuant to this opinion should vacate the suspension of sentence heretofore allowed.

*Judgment affirmed.*

GILLEN, P. J., and COLLIER, J., concur.