## Richmond

## Manuel C. Quintana

### v.

## Commonwealth of Virginia

September 9, 1982.

Record No. 811845.

Present: Carrico, C.J., Cochran, Poff, Compton, Thompson, and Stephenson, JJ., and Harrison, Retired Justice.

130

132

*Jose R. Recinto, Jr. (Benjamin N. A. Kendrick; Domingo L. Ordoveza; Ordoveza & Recinto,* on brief), for appellant.
*Thomas D. Bagwell, Assistant Attorney General (Gerald L. Baliles, Attorney General,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

This is an automatic review of a death sentence and the underlying conviction of capital murder in the commission of robbery while armed with a deadly weapon.

The victim of the crime, Ofelia Quintero, a 72-year-old native of Cuba, was killed by multiple hammer blows to he. head, neck, and back. Numerous articles missing from her Arlington apartment were discovered in a search of a car owned by Manuel C. Quintana. Quintana, a Cuban native who speaks no English, was arrested, charged with capital murder, and, in a bifurcated trial, convicted and sentenced by a jury to death. The trial court confirmed the verdict. Defendant asks us to reverse his conviction or, in the alternative, to commute his sentence to life in prison.[1]

## I. PRE-TRIAL MOTIONS

### A. Motion to Postpone Trial

One week before trial, defendant asked the trial court to grant him "more time" to search for alibi evidence. He was un-

---

[1] Defendant assigns 28 errors. Several, never addressed on brief or in oral argument, are taken as waived. Others, argued on brief, were not preserved by contemporaneous objection at trial. One issue argued on brief was neither properly preserved nor raised by assignment of error. Another rests upon arguments advanced for the first time in this Court. Applying Rules 5:20(b) and 5:21 in accord with repeated precedent, we will not notice such matters. *Whitley* v. *Commonwealth*, 223 Va. 66, 76, 286 S.E.2d 162, 168 (1982); *Clanton* v. *Commonwealth*, 223 Va. 41, 55, 286 S.E.2d 172, 179 (1982). *See also Engle* v. *Isaac,* 456 U.S. 107 (1982).

Defendant considers the death penalty cruel and unusual punishment *per se* and asks us to declare Virginia's capital murder statutory complex unconstitutional on its face. Advancing no other reason, he "reasserts here those arguments . . . which heretofore have been raised and rejected by this Court." We adhere to our former decisions.

able to name any witness or give the court assurance that any could be found. The trial court denied the motion but appointed an 'investigator and authorized expenditure of state funds to finance an investigation of certain records located in the state of Texas which counsel thought might be material.

As defendant concedes, whether a trial should be postponed lies within the sound discretion of the trial judge. *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964); *Shifflett v. Commonwealth*, 218 Va. 25, 30, 235 S.E.2d 316, 319 (1977). Defendant contends that denial of his motion was an abuse of discretion. We disagree.

An attorney was appointed to represent defendant at the preliminary hearing held March 23, 1981, two days after his arrest. On April 23, the court appointed two additional attorneys, both versed in the Spanish language. The record shows that, before trial began, defense counsel had interviewed prospective witnesses, examined the Commonwealth's demonstrative evidence, and otherwise investigated and prepared defendant's case with great diligence and professional skill. After working together for nearly six weeks, the three attorneys were unable to identify any evidence not already explored, other than the documentary evidence in Texas. To pursue that lead, the trial court employed an investigator at public expense, an act of judicial grace not constitutionally required. *Martin v. Commonwealth*, 221 Va. 436, 446, 271 S.E.2d 123, 129-30 (1980).

Defendant has shown no prejudice resulting from what he claims was an abuse of discretion, and we will affirm the trial court's ruling. *Rosenberger v. Commonwealth*, 159 Va. 953, 957, 166 S.E. 464, 465 (1932).

### B.  Motion to Suppress

The property stolen from the victim's apartment was seized pursuant to a search warrant. The search, the seizure, the warrant, and the supporting affidavit were regular in all respects save one. The issuing magistrate failed to certify the affidavit before he filed it with the clerk of the court, and defendant contends that the trial court should have excluded the evidence seized in the search.

Code § 19.2-54 provides that the affidavit
"shall be certified by the officer who issues such warrant and delivered . . . to the clerk . . . within seven days. . . .

"Failure . . . to file the required affidavit shall not invalidate any search . . . unless such failure shall continue for . . . thirty days. . . ."

The magistrate filed the affidavit timely, and defendant does not challenge the finding of probable cause. Rather, he urges us to announce and apply an exclusionary rule which he believes the statute mandates. The premise of his argument is that an uncertified affidavit is not "the required affidavit". Hence, he concludes, if the statute expressly provides that failure to certify the affidavit does not invalidate a search unless the failure continues for 30 days, the statute necessarily implies that when, as here, the failure continues beyond that time, the search is invalid even if conducted the day the affidavit is filed.

We do not accept the premise, and we reject the conclusion. Having in mind the Fourth Amendment purposes the statute was designed to foster, we believe "the required affidavit" means the affidavit required to support issuance of a search warrant. Under the Fourth Amendment warrant requirement, the content of that affidavit must be sufficient to support a finding of probable cause by a neutral and detached magistrate. The constitution does not require the magistrate to certify an affidavit. The purpose of that requirement in our statute is to insure that the affidavit filed with the clerk for the information of the accused is the same affidavit upon which the finding of probable cause was based. At the suppression hearing, the affiant identified the challenged affidavit as the one he subscribed before the magistrate.

Finding that the statutory purpose was fully served and that the omission of the magistrate's signature in the jurat caused defendant no prejudice, we hold that the trial court properly overruled defendant's motion to suppress.

## II.  *THE GUILT TRIAL*

### A.   Sufficiency of the Evidence

The Commonwealth produced no eye-witness to the crime, and defendant maintains that the evidence was insufficient to prove that he committed capital murder. We review the evidence in the light most favorable to the Commonwealth.

On March 19, 1981, at approximately 2:30 p.m., the victim's body was found lying face-down in a pool of blood on the floor of

her kitchen. Nearby walls and a radiator were splattered with blood. An autopsy revealed 13 discrete lacerations of both sides and back of the head. The skull was exposed and fractured in 11 places. There were five crescent-shaped contusions on the shoulder blades and back and an undeterminable number of bruises on the back of the neck. Any but two of the head wounds could have been fatal. The body was fully clothed, and there was no evidence of sexual abuse. The time of death might have been as early as 8:00 a.m. or as late as 2:30 p.m. Hair and blood samples identified a carpenter's hammer as the murder weapon.

The small apartment, occupied by the victim and her son, Nelson Echemendia, had been ransacked. Numerous items of jewelry, clothing, and other personal goods, including a cord torn from a telephone, were missing. Two days after the crime, the stolen property was discovered in defendant's car.

The apartment showed no signs of forced entry or a struggle. A coffee pot was on the stove, coffee cups and a water jug were on the table, and an extra chair was in the kitchen. Defendant's fingerprints were lifted from the water jug and from a camera. Echemendia testified that the camera had been inside its case when he left for work the morning of the crime and that, prior to that day, defendant had had no occasion to touch the camera.

Echemendia testified that defendant was a social acquaintance he and his mother had met in a Cuban refugee camp in Pennsylvania. Defendant had been a visitor in their apartment, and on one occasion had used Echemendia's hammer, the murder weapon. Defendant was aware that Echemendia was saving money for a trip to Florida. Echemendia had saved approximately $1000, mostly in twenty-dollar bills, which he kept in a wallet in the apartment. He also kept the identification card issued by the Immigration and Naturalization Service in his wallet. The card was among the articles found in defendant's car.

The day before the crime, defendant had been released from jail in Fairfax County with only 15 cents in his pocket. At 2:00 p.m. on the day of the crime, he appeared at a used-car lot wearing a hat similar to one missing from the apartment. He bought a car for $350 and paid the salesman in twenty-dollar bills. Later that day and the next, defendant made cash expenditures of more than $250. At the time of his arrest on March 21, he had $162 on his person.

The Commonwealth introduced as an exhibit a beige, three-piece suit defendant was seen wearing the day of the crime.[2] The suit had "blood splatters on the sleeves" and "on the lower front portion of both legs of the pants." Forensic analysis showed that the blood type was consistent with that of both the defendant and the victim.

Shortly after 1:00 p.m. on the day of the crime, defendant appeared in the office of the clerk of the General District Court of Fairfax County. Carmen Salgado, a deputy clerk fluent in the Spanish tongue, testified that defendant "asked me help him to find his attorney," who had represented him in court the previous day. Salgado "asked him what the nature of the problem was" and "he started telling me his story." Defendant said that he had found an old lady "injured at the bottom of the stairs" with gashes "[o]n the upper part of her body, her head." Defendant explained that he had not called the police because "he was scared and that he ran." Salgado tried, unsuccessfully, to call an attorney at a number defendant had written on a piece of paper. Salgado advised defendant "not to run" and that "[i]f he was innocent, then I would help him." Before defendant left, Salgado noticed "two drops of blood on his shirt."[3]

We consider defendant's sufficiency challenge in its several parts.

### 1.   *Elements of Capital Murder*

#### a.   Intent to Steal

■ In answer to a question propounded by the jury, the trial court announced that counsel had agreed that the killing and the

---

[2] This was shown by the testimony of Caunabot Suarez with whom defendant had spent the previous night. Before Suarez took the stand, the Commonwealth's Attorney removed the suit from the courtroom and showed it to the witness. Defense counsel moved for a mistrial. The trial court overruled the motion, and counsel cross-examined the witness at length.

We agree with the trial court that trial exhibits are public records open to inspection by counsel, jurors, and witnesses alike. Defendant does not contend, and there is nothing of record to show, that the exhibit was altered or that the witness was coached to give false testimony, and we find no merit in defendant's complaint.

[3] Salgado's testimony was introduced by the Commonwealth on rebuttal over defendant's objection. Defendant proffered surrebuttal testimony of defendant's attorney to show why he was looking for a lawyer. The trial court excluded the testimony. Defendant assigns error to both evidentiary rulings. As we will explain in part IIA 2 b, *infra*, we do not believe these rulings constitute reversible error.

robbery had been committed by the same person. Yet, defendant contends on brief that there was no evidence to prove "his intent to steal at the time of the killing". We cannot agree.

A similar contention was made in *Whitley v. Commonwealth*, 223 Va. at 72, 286 S.E.2d at 166. Here, as there, we look to the events and circumstances surrounding the crime to determine whether they fairly support the conclusion that the motive for the murder was theft from the person or the dominion of the victim.[4] Defendant had only 15 cents when he was released from the Fairfax jail the day before the crime, and he had no job. Defendant knew that the victim's son was saving money for a trip. Within hours after the killing, defendant paid for a car with bills of the same denomination as the money missing from the victim's apartment. Two days later, other property taken from the apartment was found in that car. The arrangement of the extra chair, water jug, coffee pot, and cups and the lack of evidence of a struggle or sexual abuse indicate that the only purpose of the killing was to facilitate the theft. "Criminal intent, a state of mind; may be, and often must be, shown by circumstantial evidence." *Id.* at 73, 286 S.E.2d at 166.

### b. Armed with Deadly Weapon

In one assignment of error, defendant maintains that the "statute is unconstitutional as applied." The burden of the argument addressed to this assignment is that the evidence is insufficient to prove that the killing was committed "while armed with a deadly weapon", Code § 18.2-31(d), and that any doubt about the meaning of those words should be resolved in his favor. "The pivotal issue," he asserts, "is whether the *use* of the hammer which was *not carried* by the defendant satisfies the [statutory] requirement . . .".

Amplifying his argument, defendant says that under our statute "capital punishment was reserved . . . for . . . the 'most reprehensible crimes' "; that the language the legislature chose must be construed and applied strictly; that " 'armed' connotes the carrying of a weason and not its mere usage"; and that a hammer is not a deadly weapon within the contemplation of the statute under which he was convicted.

---

[4] Here, as in *Whitley*, we need not decide whether Code § 18.2-31(d) requires the Commonwealth to prove intent to steal at the time of the killing.

As we understand his argument, defendant contends that the General Assembly has decided that a murder committed by a robber with a hammer seized at the scene of the crime is less reprehensible than a murder committed by a robber with a knife carried on his person. We do not believe the General Assembly intended to make such abstruse distinctions in degrees of criminal culpability when it selected the offenses reserved for the ultimate penalty.

Subsection (d) was added to the capital murder statute by Acts 1976, c. 503. In two cases decided prior to that enactment, *Floyd v. Commonwealth*, 191 Va. 674, 684, 62 S.E.2d 6, 10 (1950); and *Pannill v. Commonwealth*, 185 Va. 244, 254, 38 S.E.2d 457, 462 (1946), we quoted with approval the definition of "deadly weapon" stated in 40 C.J.S., Homicide § 25 which reads in part:

> " 'A deadly weapon is one which is likely to produce death or great bodily injury from the manner in which it is used, and whether a weapon is to be regarded as deadly often depends more on the manner in which it has been used than on its intrinsic character. . . .' "

*See also Pritchett v. Commonwealth*, 219 Va. 927, 929, 252 S.E.2d 352, 353 (1979); *Cox v. Commonwealth*, 218 Va. 689, 691, 240 S.E.2d 524, 526 (1978).

When the General Assembly enacts a statute in language with a long history of definition by this Court, we believe it intends that the words carry their historical construction. Considering the character of the tool introduced as an exhibit in this case, the manner in which it was used, and the results of its use, we hold that the hammer was a deadly weapon within the intendment of the statute.

In defendant's view, a person is not "armed" with a weapon in the criminal sense of that word unless he acquires it and carries it upon his person for some interval of time (for how long, he does not suggest). In our view, a person is criminally armed from the moment he seizes a weapon with intent to use it for a criminal purpose.

We conclude, therefore, that the statute was not unconstitutionally applied to the facts in this case.

## 2. *Time of Death and Defendant's Alibi*

### a. Medical Examiner's Report

■ The uncontradicted evidence shows that defendant appeared at the clerk's office shortly after 1:00 p.m. and at a used-car lot at 2:00 p.m. Defendant offered in evidence the written report of the medical examination conducted in the late afternoon of the same day. Fixing the time of death at 2:00 p.m., the report stated that the body had been discovered at 2:30 p.m. and that the victim "was known to be alive about 1:00 p.m." Over defendant's objection, the trial court deleted this statement as hearsay. Defendant says that this statement was crucial to his alibi defense and assigns error.

Defendant called Dr. Sheehy, the medical examiner, and interrogated him about the statement. The witness testified that the police had informed him that a neighbor had observed that the victim's apartment door was closed at 1:00 p.m. and that the body had been discovered at 2:30 p.m. Dr. Sheehy explained that, based upon this information, "the impression I had is that whatever happened had happened between that period, between 1:00 p.m. and 2:30." Cross-examined by the Commonwealth, Dr. Sheehy said that his medical findings "would be consistent with the death from as early as 8:00 to 10:00 o'clock in the morning."

As appears from the face of the written report, and as explained by the examiner's testimony, the deleted statement was a conclusory opinion induced by hearsay. Reports of the medical examiner introduced pursuant to Code § 19.2-188 are prima facie evidence of the facts stated therein. *Bass v. Commonwealth,* 212 Va. 699, 700, 187 S.E.2d 188, 189 (1972). But an opinion in such a report is not competent evidence, *Ward v. Commonwealth,* 216 Va. 177, 178, 217 S.E.2d 810, 811 (1975) (cause-of-death opinion), and we find no merit in this assignment of error.

### b. Rebuttal and Surrebuttal Testimony

Defendant assigns error to two additional evidentiary rulings related to his alibi defense. The testimony of Carmen Salgado, the deputy clerk, was introduced by the Commonwealth after defendant had rested his case. Defendant protests that the Commonwealth "introduced new matters" which "could have been introduced in its case in chief."

Salgado testified that defendant came to the clerk's office shortly after 1:00 p.m. on the day of the crime; that he was looking for his lawyer because he had just found an elderly lady with gashes on her head and body; and that she noticed blood on his shirt. The time of death did not become a significant circumstance until Dr. Sheehy was examined in defendant's case in chief. Salgado's testimony was offered to contradict any inference raised by Dr. Sheehy's testimony that the victim was alive at 1:00 p.m.

We agree that Salgado's testimony might more appropriately have been introduced as part of the Commonwealth's case in chief. But we leave the order of proof in a criminal case to the sound discretion of the trial court, *Hargraves v. Commonwealth*, 219 Va. 604, 608, 248 S.E.2d 814, 817 (1978), and we will not disturb the ruling here.

In response to Salgado's testimony that defendant had said he was looking for the lawyer who had represented him on March 18, the day he was released from the Fairfax jail, defendant vouched that the attorney would testify that he had instructed his client to contact him the next day. Observing that the proffered testimony was only "an added reason" why defendant was trying to find his lawyer the day of the crime, the trial court disallowed the evidence.

Absent an abuse of discretion, appellate courts uphold a trial court's decision whether to admit surrebuttal evidence. *See, e.g., State v. Ward*, 284 S.E.2d 881 (W. Va. 1981); *Gregory v. United States*, 393 A.2d 132 (D.C. Ct. of App. 1978); *State v. Mays*, 65 Wash. 2d 58, 62, 395 P.2d 758, 762 (1964), *cert. denied*, 380 U.S. 953 (1965); *State v. Blanton*, 111 Ohio App. 111, 120, 170 N.E.2d 754, 760 (1960). Unless it is merely cumulative, surrebuttal evidence is admissible if it contradicts or alters the import of material evidence introduced for the first time in rebuttal. *See* 6 Wigmore, Evidence §§ 1873-74 (Chadbourn rev. 1976). The import of Salgado's testimony was material to rebut defendant's theory that Quintero was still alive after 1:00 p.m. While the proffered surrebuttal may have shown that defendant had an innocent reason to contact the attorney who had been representing him, proof of that reason does not contradict the incriminating inference raised by the circumstances detailed in Salgado's testimony.

At most, the proffered testimony would have supplied "an added reason" underlying one of the several circumstances from which the incriminating inference springs. While we do not agree

with the Attorney General's position that this testimony was inadmissible, we find no abuse of discretion in the trial court's ruling.

### 3. *Different Criminal Agent*

■ Defendant suggests that the evidence supports his hypothesis that Orlando Dominguez, who lived with a friend in an apartment above the victim's apartment, was the criminal agent. Dominguez had been a frequent visitor until the friendly relationship was interrupted by a dispute over a telephone bill. During the investigation of the crime, Dominguez refused to allow officers to scrape his cuticles for a sample of "a reddish material . . . thought to be blood." The officers found blood stains on the hallway stairs leading to Dominguez's apartment, on the door to his apartment, and on a pillow case in his bathroom.

Dominguez testified that he had spent the day the crime was committed with his friend, Umberto Amilio. Amilio stated that he and Dominguez had been together all day except for a 20-minute interval between 1:30 and 2:00 p.m. when Dominguez left Amilio's apartment "to claim some money that was owed him, somebody by the name of Roger Smith."

This testimony contradicts none of the evidence against defendant. If it is taken as true and if the crime occurred before defendant arrived at the clerk's office, Dominguez was not the criminal agent. While the blood stains discovered in and around Dominguez's apartment and on his fingernail might support an inference that he handled the bloody corpse, that inference is not inconsistent with his alibi. The verdict shows that the jury believed Dominguez's alibi.

■ Assessing the facts and circumstances we have summarized and considering the reasonable inferences they raise, we are of opinion that the Commonwealth successfully bore its burden of proving "beyond a reasonable doubt that motive, time, place, means and conduct concur in pointing out the accused as the perpetrator of the crime." *Boykins* v. *Commonwealth*, 210 Va. 309, 312, 170 S.E.2d 771, 773 (1969).

### B. Defendant's Absence at Trial

■ During the presentation of the Commonwealth's evidence, the trial judge permitted defendant to address the court. On several other occasions during the trial, defendant interrupted the

proceedings with verbal protests. The trial court warned him that if he persisted he would be removed from the courtroom. In the final minutes of the Commonwealth's rebuttal summation, recorded on the last two pages of the transcript, defendant arose and began to speak. The trial court suspended the argument, advised defendant that he would be ejected if he made any further disturbance, and told him that this was his last warning. Defendant continued to protest, and the court admonished him to desist. Defendant resumed what the court described as a "harangue", and the court ordered him removed from the courtroom. At some point after the jury retired to consider its verdict, defendant returned and, at the direction of the court, the reporter and the interpreter read aloud the transcript of proceedings recorded in his absence.

Defendant argues that the trial court violated his "constitutional rights to be present at all stages of his trial." We take it he refers to his Sixth Amendment right of confrontation and his Fourteenth Amendment right to due process of law.

The Sixth Amendment right of confrontation is "a fundamental right", *Pointer* v. *Texas*, 380 U.S. 400, 403 (1965), and there is always a " 'presumption against [a] waiver' of fundamental constitutional rights", *Johnson* v. *Zerbst*, 304 U.S. 458, 464 (1938). But an accused may *forfeit* his right to be present at his trial "if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Illinois* v. *Allen*, 397 U.S. 337, 343 (1970). *See also Diaz* v. *United States*, 223 U.S. 442, 457-58 (1912) (citing *Falk* v. *United States*, 15 App. D.C. 446 (1899), *cert. denied*, 181 U.S. 618 (1901), affirming a conviction of a defendant who escaped from custody while his trial was in progress). And, as Justice Brennan observed in his concurring opinion in *Allen*, "[d]ue process does not require the presence of the defendant if his presence means that there will be no orderly process at all." 397 U.S. at 350.

■ It may be, as defendant says, that his conduct was not as egregious as that reviewed in *Allen*. Confined as we are to the written record, we cannot tell. But it is clear that his behavior was disorderly, disruptive, disrespectful, and persistently contumacious in the face of repeated warnings. Of the three sanctions approved in *Allen*, 397 U.S. at 343-44, the alternative the trial court em-

ployed was the one most favored by the Supreme Court, and we reject defendant's constitutional challenge.

Nor do we find any merit in defendant's contention that his expulsion violated his statutory right to be present "during the trial." Code § 19.2-259. While we have held that "the accused cannot waive it", *Noell* v. *Commonwealth*, 135 Va. 600, 609, 115 S.E. 679, 681 (1923), we have never held that an accused cannot forfeit the right accorded by this statute. For the reasons summarized in the constitutional analysis in *Allen*, we decline to do so now.

Expanding his argument under this assignment of error, defendant invokes the same statute in support of his complaint that he was absent during a conference called pursuant to Code § 19.2-169. Defense counsel requested an examination by a Spanish-speaking psychiatrist. The trial court appointed an English-speaking psychiatrist to conduct the examination through an interpreter. Counsel objected, and the trial court offered to appoint the psychiatrist defendant requested as well. Defendant declined and elected to stand on his objection.

> "Generally stated, the rule is that [the accused] must be present on his arraignment, when any evidence is given or excluded, when the jury is charged, when the trial court wishes to communicate with the jury in answering questions by them, and when the jury receives further instructions. He must be present at every stage of the trial proper."

*Palmer* v. *Commonwealth*, 143 Va. 592, 605, 130 S.E. 398, 402 (1925).

We are of opinion that the conference, held in chambers on defendant's motion five days before the date set for trial, was not a "stage of the trial proper" within the intendment of Code § 19.2-259. *See Williams* v. *Commonwealth*, 188 Va. 583, 593, 50 S.E.2d 407, 412 (1948) (chamber conference conducted during trial on evidentiary question not "part of the actual trial").

## C. Closing Argument

During closing argument, the Commonwealth's Attorney said:

"On the suit we have blood consistent with the defendant's and consistent with the victim's. If it is the defendant's blood, where is the evidence that the defendant was ever bleeding between the time he left Fairfax County Jail to the time the suit was recovered[?]"

Defendant argues that these remarks constitute a comment on his failure to testify in violation of his rights under the Fifth Amendment and Code § 19.2-268.[5] We see nothing in the remarks to suggest that the missing evidence should have come from Quintana himself or that it could come from him alone. Many people saw defendant the day he was released from the Fairfax jail and the next day; none testified that he was bleeding. "[T]he test is whether, in the circumstances of the particular case, 'the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' *Knowles* v. *United States*, 224 F.2d 168, 170 (10th Cir. 1955)." *Hines* v. *Commonwealth*, 217 Va. 905, 907, 234 S.E.2d 262, 263 (1977). *See also United States* v. *Anderson*, 481 F.2d 685, 701 (4th Cir. 1973), *aff'd on other grounds*, 417 U.S. 211 (1974).

That test is not satisfied in this case, and we find no error in allowing the argument.

Having considered all the issues properly before us, we find no error in the conduct of the guilt trial, and we will affirm the conviction of capital murder.

### III. *THE PENALTY PROCEEDINGS*

#### A. Before the Jury

The jury reconvened the day after the verdict of guilty was rendered, and a separate proceeding was held on the issue of penalty, pursuant to Code § 19.2-264.3(C). As mandated by the statutory scheme, the proceeding was limited to a determination whether the defendant should be sentenced to death or life imprisonment. § 19.2-264.4(A). At such proceeding, the rules of evidence apply. The evidence presented may include the circum-

---

[5] Quintana makes the same argument concerning three other statements of the Commonwealth's Attorney. Unlike the complaint we address, defendant failed to make contemporaneous objection, and we will not notice these complaints on appeal. See note 1 *supra*. *See also United States* v. *Nasta*, 398 F.2d 283, 285 (2d Cir. 1968).

stances surrounding the offense, the history and background of the defendant, and facts in mitigation. § 19.2-264.4(B).

The statute further provides that the death penalty shall not be imposed unless the prosecution proves beyond a reasonable doubt certain factors of "dangerousness" or "vileness." The so-called "dangerousness" element is satisfied if the Commonwealth shows there is:

"[A] probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which [defendant] is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society, . . ." § 19.2-264.4(C).

Under the "vileness" provisions, the prosecution must prove that:

"[Defendant's] conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim." *Id.*

During the sentencing phase, a portion of the evidence presented by the Commonwealth included testimony of witnesses to whom defendant had made certain statements about his past criminal activity; the defendant called one witness who stated defendant formerly had been courteous, kind, and friendly to the witness and her daughter.

Called by the prosecutor, Pedro Castro testified that he was a friend of Quintana and that he met defendant in early 1981 when both were inmates in the Arlington County Jail. According to Castro, Quintana stated that "he killed a man" in Cuba by cutting his throat; that defendant was in jail at the time for "carrying off a girl" and raping her; that he had planned "to carry off a girl again" from a junior high school in Virginia, but was frustrated in this scheme because the police were called; that "he had a house" in Virginia in which to keep hostages "that he picked up"; and that when defendant was released from jail he planned to "grab" a specified individual.

The witness Suarez, see note 2 *supra*, testified that when he first met defendant, Quintana stated that he had committed a homicide in Cuba; that "he had found it necessary to kill some-

body, because this gentleman had made his life impossible for him"; that "he had been jailed many times" as the result of "many, many problems with the [Cuban] police"; and that defendant had been "brought" to the United States directly from a Cuban jail. Suarez was of the opinion that Quintana was "bragging" about his past conduct in order to create a "macho" image.

Under the trial court's instruction that required the Commonwealth to prove "at least one of the following two alternatives," *i.e.*, "dangerousness" or "vileness," the prosecutor argued to the jury that both alternatives had been proved. After deliberating, the jury fixed defendant's punishment at death.[6]

■ Defendant contends Castro's testimony that recounted Quintana's statements was inadmissible hearsay. We disagree. Defendant's utterances to Castro were prior extra-judicial declarations freely made by a party to the criminal trial, and they were inconsistent with defendant's position at trial, *i.e*, that his prior history failed to show he had the propensity to commit future criminal acts. Consequently, the statements were properly received under the party admissions exception to the hearsay rule. *Land* v. *Commonwealth*, 211 Va. 223, 229, 176 S.E.2d 586, 590-91 (1970); *Tyree* v. *Lariew*, 208 Va. 382, 385, 158 S.E.2d 140, 143 (1967). *See Skinner* v. *Commonwealth*, 212 Va. 260, 262-63, 183 S.E.2d 725, 728 (1971); C. Friend, *The Law of Evidence in Virginia*, § 251 (1977).

■ Defendant also contends that his conduct as shown by the record does not support a finding of "vileness," and hence the jury improperly imposed the death penalty. We reject this contention.

---

[6] On appeal, Quintana argues the form of verdict was defective. The record shows defendant specifically approved the verdict form before it was submitted to the jury, specifically disclaimed any objection to the form after the verdict was rendered, failed to raise the issue in post-trial motions to set aside the verdict, and failed to raise the issue in any assignment of error on appeal. "[W]e will not notice a non-jurisdictional question raised for the first time in a . . . brief filed in this Court." *Whitley* v. *Commonwealth*, 223 Va. at 79 n.2, 286 S.E.2d at 170 n.2; Rule 5:21. *See* note 1, *supra. See also Coppola* v. *Warden*, 222 Va. 369, 282 S.E.2d 10 (1981).

The dissent misinterprets the basis of our decision not to consider defendant's belated contention about the verdict form, noting "[t]he majority refused to consider this argument on the grounds that defendant had not preserved the issue at trial and had not raised it by assignment of error on appeal." There was not only acquiescense but also *affirmative ratification* of the verdict form by the defendant, both before the form was tendered to the jury and after the verdict was returned.

The trial court ruled there was no evidence of torture and thus, in the pertinent instruction, limited the jury's consideration of the "vileness" factor to whether defendant's conduct "in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved depravity of mind or aggravated battery to the victim." Manifestly, the evidence supports each of these elements. The defendant, 28 years of age, attacked a 72-year-old woman in her apartment with a hammer, inflicting over a dozen lacerations, contusions, and bruises to her head, neck, and shoulders. The skull was fractured in 11 places; most of the head wounds could have been fatal. Such outrageous, inhumane, depraved conduct during the performance of an exaggerated beating of a helpless victim furnishes a sound basis for imposition of the extreme penalty.

### B. Before the Trial Judge

Subsequent to the jury's verdict fixing punishment, and pursuant to Code § 19.2-264.5, the trial court ordered a probation officer to investigate and report upon the defendant to aid the court in determining whether the sentence was appropriate and just. Following receipt of the report, another hearing was held in August of 1981, after which the trial court confirmed the jury's verdict and imposed the death sentence.

Quintana argues the trial court erred in failing to reduce the sentence to life imprisonment. Noting the probation officer's efforts to obtain criminal records upon defendant from Cuba were unsuccessful, Quintana contends the report contained no information bearing upon his future "dangerousness" and thus the trial judge abused his discretion in confirming the jury verdict. That contention has no merit.

When the trial judge sentenced defendant, he had the benefit of all the evidence presented to the jury. In addition, the prosecutor proved during the August hearing that, while in jail awaiting sentencing, defendant made two knives from metal supports in his shoes. Also, during the same period, he had secreted in his cell a 35-foot rope made of jail uniforms tied together.

During his remarks from the bench at sentencing the trial judge said:

"When it came to a determination of the penalty in this case, the jury was assisted with a bifurcated trial which en-

abled them to hear some background information in addition to what they heard during the trial. The defendant may actually be better off in that no record of his from Cuba was available, and basically what they heard about his background was what emerged from his own lips. There was sufficient evidence before the jury to justify their conclusions that there was a probability that if he were to continue to live in the community that he would commit criminal acts of violence, constituting a serious threat to society. There can be no question that the circumstances attending the death of the deceased were outrageously and inhumanly conducted involving depravity of mind and aggravated battery to the victim. The people of Virginia, through their elected representatives, have decided that certain types of criminal conduct are so severe and outrageous that they must be deterred by the ultimate penalty. This is one of those cases."

Our review of this record convinces us the evidence fully supports the trial court's conclusions and that there was no abuse of discretion in confirming the sentence to death.

## IV.  *Sentence Review*

■■■ Code § 17-110.1 requires this Court, in addition to any trial errors enumerated by appeal, to consider and determine (1) whether the death sentence "was imposed under the influence of passion, prejudice or any other arbitrary factor" and (2) whether the sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

Quintana argues the sentence was imposed under the influence of arbitrary factors. He says the only evidence of future dangerousness came from Castro, a convicted felon. He notes there was no torture or sexual abuse of the victim. He repeats his contention that a hammer is not ordinarily a lethal weapon and its use here should not be considered an indication of a depraved mind. He contends the verdict was "clouded by passion and prejudice" because the jury "ignored" the testimony of his only witness in mitigation.

In addition, defendant argues the sentence was excessive and disproportionate. Recounting alleged deficiencies in the probation report and comparing with this case the atrocious facts of other

capital murder cases we have decided, Quintana asserts the death penalty here is unjustified.

We disagree with the foregoing contentions. The jury and, in turn, the trial judge had abundant evidence upon which to base their findings of both "dangerousness" and "vileness." We have already addressed in part IIIA, *supra*, the sufficiency of the proof upon the latter requirement.

As to the factor that defendant will pose a continuing serious threat to society, we need only refer again to the heinous circumstances surrounding this homicide, committed upon a 72-year-old woman during the course of robbery. The jury and trial court could properly conclude that if defendant has killed once under these circumstances for the mere purpose of obtaining a sum of money, he is likely to kill again, whether incarcerated or not, for an equally devious purpose. Furthermore, the jury and the trial judge obviously accepted Castro's testimony, as they had a perfect right to do, which showed Quintana's proclivity for plotting to take hostages and for committing other acts of violence. Indeed, among the items found in defendant's automobile after the murder were chains, padlocks, rope, cloth belts, and pieces of cord, all items susceptible of being used to detain abductees and hostages. Consequently, we hold that no arbitrary factors influenced the sentence in this case.

Upon the questions of excessiveness and disproportionality, we have examined the records in all capital murder cases reviewed by this Court to determine "whether generally in this jurisdiction triers of fact 'impose the death sentence for conduct similar to that of the defendant.'" *Giarratano* v. *Commonwealth*, 220 Va. 1064, 1079, 266 S.E.2d 94, 103 (1980), quoting *Stamper* v. *Commonwealth*, 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), *cert. denied* 445 U.S. 972 (1980). Our examination discloses that this sentence is not excessive or disproportionate to the penalty imposed in similar cases, considering both this crime and this defendant. For example, in *Coppola* v. *Commonwealth*, 220 Va. 243, 257 S.E.2d 797 (1979), *cert. denied* 444 U.S. 1103 (1980), *Turner* v. *Commonwealth*, 221 Va. 513, 273 S.E.2d 36 (1980), *cert. denied* 451 U.S. 1011 (1981), and *Clanton* v. *Commonwealth*, note 1 *supra*, we have sustained the imposition of death sentences where the capital murders were committed during the course of armed robbery. In *Coppola*, there was a finding of only "vileness," the female victim being severely and repeatedly beaten about the

head and strangled. In *Turner* and *Clanton*, there were findings of "vileness" and "dangerousness." The *Turner* victim was shot three times during the robbery of his jewelry store; the female victim in *Clanton* was stabbed and strangled by a cord in her apartment. The brutality visited upon Quintana's victim is comparable to that inflicted in our prior similar death penalty cases.[7]

For all the foregoing reasons, we hold the trial court committed no error. Furthermore, we have independently decided from a review of the entire record that the sentence of death was properly assessed. Consequently, the judgment below will be

*Affirmed.*

POFF, J., concurring in part and dissenting in part.

I would uphold the conviction of capital murder but commute the sentence of death to imprisonment for life.

On appeal, defendant argued that the jury's penalty verdict was ambiguous "and therefore violated his constitutional right to a unanimous verdict." The majority refused to consider this argument on the grounds that defendant had not preserved the issue at trial and had not raised it by assignment of error on appeal. The majority misconceives the nature and scope of appellate review of the death penalty.

Code § 17-110.1 commands this Court to "consider and determine . . . [w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." We must consider the disproportionality question "[i]n addition to consideration of any errors in the trial enumerated by appeal." *Id.* The statutory command is absolute, the death-penalty review is automatic, and the disproportionality inquiry is not conditioned upon defense counsel's compliance with rules governing appellate procedure in noncapital cases. We have only recently held that the waiver rule (*i.e.*, that an error assigned is waived if not argued on appeal) does not apply to the penalty review mandated by Code § 17-110.1(C). *Fitzgerald* v. *Commonwealth*, 223 Va. 615, 639, 292 S.E.2d 798, 812 (1982). While I agree that the waiver rule, the contemporaneous

---

[7] We expressly reject the dissent's contention that our procedural ruling, note 6 *supra*, when applied to the "disproportionality inquiry," violates the statutory command of Code § 17-110.1.

objection rule, and Rule 5:21 apply to defendant's appeal of his capital murder conviction, I believe their application to a determination of disproportionality *vel non* violates the statutory command.

In making such a determination, we must conduct an independent survey of similar capital cases, compare the penalties imposed, and decide whether Virginia juries generally impose the death penalty in such cases. *Stamper* v. *Commonwealth*, 220 Va. 260, 283-84, 257 S.E.2d 808, 824 (1979). In order to conduct such a survey, we must be able to identify cases that are similar to the one at bar. Our task is impossible in this appeal.

Code § 19.2-264.2 provides that "a sentence of death shall not be imposed" except upon certain findings of "aggravating circumstances" which have come to be called "the vileness predicate" and "the dangerousness predicate." It is axiomatic that a jury's verdict in a criminal case must be unanimous. Va. Const., art. I, § 8; Rule 3A:24(a). When the legislature conditions a penalty upon such factual predicates, a jury's verdict is not unanimous unless its findings are unanimous.

Here, we know that the death-penalty decision was unanimous, but we do not know upon what finding or findings it was based. This is because, as defendant says, the verdict form is fatally ambiguous. The form, submitted by the trial court and returned without change by the jury, read as follows:

> We, the jury, on the issue joined, having found the defendant guilty of the willful, deliberate and premeditated killing of Ofelia Quintero in the commission of robbery while armed with a deadly weapon and that after consideration of his prior history that there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society *or* his conduct in committing the offense is outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind or aggravated battery to the victim, and having considered the evidence in mitigation of the offense, unanimously fix his punishment at death [emphasis added].

The trial court did not instruct the jurors to delete any finding or part or parts of any finding upon which they failed to reach unanimous agreement. Yet, the majority conducts its dispropor-

tionality analysis upon the theory that all the jurors agreed that the Commonwealth had established both the dangerousness predicate and the vileness predicate. But this is no more than a theory. The jury's verdict stated the two death penalty predicates in the alternative. No one can tell whether the jury found both predicates or only one, and if only one, which one. Indeed, it is possible that some jurors found only the dangerousness predicate and other jurors only the vileness predicate, while other jurors found both. Even if a plurality or a majority of the jurors agreed upon one or both of the death-penalty predicates, the verdict is not constitutionally sufficient.*

The possibility of diversity in the verdict is heightened by the fact that the jurors were told in a separate instruction that they could impose the death penalty if the Commonwealth proved "at least one" of the statutory predicates. An individual juror could have interpreted that instruction to mean that he was free to vote for the death penalty if he found only one of the predicates, even if all the other jurors disagreed with his finding.

For purposes of the disproportionality analysis, "similar cases" are those in which the penalties were based upon the same predicate (or predicates) as that underlying the penalty under review. *Evans* v. *Commonwealth*, 222 Va. 766, 778, 284 S.E.2d 816, 822-23 (1981) (dangerousness only). *See also Fitzgerald* v. *Commonwealth, supra* (vileness only); *Clanton* v. *Commonwealth*, 223 Va. 41, 286 S.E.2d 172 (1982) (dangerousness and vileness). Because we cannot determine upon what finding or findings defendant's death penalty was predicated, we cannot identify "similar cases" for purposes of comparison. Hence, we are unable to determine whether his penalty is excessive or disproportionate. Under such circumstances, we have no authority to remand the case for a new penalty trial; our only option is to "[c]ommute the sentence of death to imprisonment for life." Code § 17-110.1(D)(2). *See Wm.*

---

* I am aware that we have rejected challenges to the verdict form in two recent appeals. But there was no room for ambiguity in either case. In *Turner* v. *Commonwealth*, 221 Va. 513, 273 S.E.2d 36 (1980), the appendix showed that the verdict form submitted by the trial court instructed the jurors to "[c]ross out any paragraph, word or phrase which you do not find beyond a reasonable doubt." See Virginia Model Jury Instructions I-437 which contains the same language. And in *James Dyral Briley* v. *Commonwealth*, 221 Va. 563, 577, 273 S.E.2d 57, 66 (1980), "[e]ach member of the jury was polled individually and each responded affirmatively that both aggravating circumstances were present."

*Patterson* v. *Commonwealth*, 222 Va. 653, 660, 283 S.E.2d 212, 216 (1981).

I am in accord with the view that the evidence is sufficient to support a finding of either death-penalty predicate, but I cannot agree that the record shows that the jury reached unanimous agreement on either, much less on both. In my view, commutation is a constitutional and statutory imperative.

STEPHENSON, J., joins in this concurring and dissenting opinion.