SYVASKY LAFAYETTE POYNER

V.

COMMONWEALTH OF VIRGINIA

Record Nos. 841434 and 841435

SYVASKY LAFAYETTE POYNER

V.

COMMONWEALTH OF VIRGINIA

Record Nos. 841539 and 841540

SYVASKY LAFAYETTE POYNER

V.

COMMONWEALTH OF VIRGINIA

Record No. 841589

Decided April 26, 1985, at Richmond

Present: All the Justices

404

*David Holland* for appellant. (Record Nos. 841434 and 841435.)

*Jacqueline G. Epps, Senior Assistant Attorney General (Gerald L. Baliles, Attorney General*, on brief), for appellee. (Record Nos. 841434 and 841435.)

*Richard B. Blackwell (Kevin P. Shea; McNamara & Shea*, on brief), for appellant. (Record Nos. 841539 and 841540.)

*Richard B. Smith, Assistant Attorney General (Gerald L. Baliles, Attorney General*, on brief), for appellee. (Record Nos. 841539 and 841540.)

*R. L. Shrecengost (Brooks & Shrecengost*, on brief), for appellant. (Record No. 841589.)

*Todd E. LePage, Assistant Attorney General (Gerald L. Baliles, Attorney General*, on brief), for appellee. (Record No. 841589.)

THOMAS, J., delivered the opinion of the Court.

## I. *Background*

In three separate trials, Syvasky Lafayette Poyner was convicted of the capital murders of five women. He was sentenced to death for each offense. The five death sentences are before the Court pursuant to the automatic review provision of Code § 17-110.1. We have consolidated Poyner's appeals of his convictions with our automatic review of his death sentences and have given the cases priority on the docket.

The five women were killed in an eleven-day period in late January and early February 1984. All were shot in the head. The murders occurred in the Hampton-Williamsburg-Newport News area of Virginia.

Poyner was arrested in Newport News on February 4, 1984, as part of the investigation into the murder of a Hampton woman. He was taken to the Newport News detective bureau where he was served with a warrant charging him with the Hampton murder.

Before any questioning, a Newport News detective, C.D. Spinner, orally advised Poyner of his *Miranda* rights. The warning given to Poyner was essentially as follows:

You have the right to remain silent.

Anything you say can and will be used against you in a court of law.

You have the right to have an attorney present before any questions.

If you cannot afford an attorney, the Court is empowered to appoint one for you.

Spinner next asked Poyner whether he understood his rights. Poyner said he did. Spinner then summarized the evidence against Poyner regarding the murder of the Hampton woman for which Poyner had been arrested. Spinner asked Poyner whether he had anything to say. Poyner responded by asking, "Didn't you tell me I had the right to an attorney?" Spinner replied, "Yes, you have the right to an attorney." At that point Spinner and another detective, who was present during the exchange, made a motion to stand up. Poyner then spontaneously said, "Let me tell you about

the car," a reference to an automobile which the police contended linked Poyner to the Hampton murder. The other detective, Edgar Browning of the Hampton police, then asked Poyner, "Did you kill her?" Poyner said, "Yes." Thereafter, Poyner confessed to five murders: the killings of Clara Paulette and Chestine Brooks in Williamsburg (the Williamsburg Case), the killings of Joyce Baldwin and Carolyn Hedrick in Hampton (the Hampton Case), and the killing of Vicki Ripple in Newport News (the Newport News Case). Approximately fourteen hours after Poyner's initial confession, he signed a rights waiver form and confessed again on videotape to the five murders.

We will separately develop the facts of each case during the discussion of the separate appeals. At the outset, however, we will dispose of certain threshold or pre-trial matters raised in the appeals.

## II. *Threshold and Pre-Trial Matters*

### A. *Constitutionality of the Death Penalty*

■ In the Williamsburg and Newport News cases, Poyner attacks the constitutionality of the Virginia capital murder statute. In both cases Poyner readily admits that this Court has previously considered the matter and has consistently ruled that the statute is constitutional. Poyner raises no arguments that have not already been carefully considered. We reject his constitutional attacks. The Virginia capital murder statute is constitutional. *See Zant* v. *Stephens*, 462 U.S. 862 (1983); *Edmonds* v. *Commonwealth*, 229 Va. 303, 329 S.E.2d 807 (1985) (this day decided).

### B. *Adequacy of the Oral Miranda Warning and Admissibility of Poyner's Confession*

In each appeal, Poyner complains either that the oral *Miranda* warning was defective or that for other reasons his confession should have been suppressed. Because of the slightly different approaches taken in each appeal, we will treat the arguments as they arose in the separate cases.

## 1. *Miranda Issue: The Williamsburg Case*

### a. *The Initial Confession Following the Oral Warning*

Poyner contends that his initial confession, following the oral *Miranda* warning, should have been suppressed because the warning was defective. He contends further that the videotaped confession which followed his execution of a written rights waiver form should have been suppressed because it was the fruit of the tainted original confession. Both contentions are without merit.

The oral warning is set out in full above. On brief, Poyner says the warning was defective because it was "so vague as to beg the question as to when the Court would appoint Poyner a lawyer . . . ." In oral argument, Poyner admitted he had been advised of the right to counsel prior to questioning but said he was not told that if he could not afford a lawyer, one would be appointed prior to questioning.

Further, during oral argument, Poyner admitted that in determining the adequacy of the warning, the statement to the defendant must be considered as a whole. Moreover, he conceded that *Miranda* v. *Arizona*, 384 U.S. 436 (1966), contains no "ironclad requirements" concerning the language that must be used to convey to defendant his rights under the Fifth Amendment.

In essence, Poyner contends the oral warning would have been sufficient had the last warning repeated a phrase previously stated in the series of warnings. The critical defect, in Poyner's view, is shown by the following comparison of what was said with what Poyner contends should have been said:

| **Portion of Actual Warning** | **Suggested Warning** |
|---|---|
| You have the right to have an attorney present before any question. | You have the right to have an attorney present before any questions. |
| If you cannot afford an attorney the Court is empowered to appoint one for you. | If you cannot afford an attorney the Court is empowered to appoint one for you *prior to any questioning.* |

Poyner argues that without the italicized language, the warning was defective. We think not.

The language which Poyner says was essential to his understanding of his rights is redundant. *Miranda* does not require such redundancy. That opinion contains no prescription as to the words that must be used in warning a defendant. *See Miranda*, 384 U.S. at 467. Here, taking the warning as a whole, it is clear that defendant was advised he had the right to the appointment of counsel prior to any questioning.

In support of his argument that the oral warning was defective, Poyner cites *Biggerstaff* v. *State*, 491 P.2d 345 (Okla. Crim. App. 1971). That case does not support his argument. *Biggerstaff* did not concern a contention that the defendant was not made aware of his right to the appointment of an attorney prior to questioning. *Biggerstaff* was concerned with whether the defendant was made aware that he had the right to the presence of his attorney during questioning. *Id.* at 352.

### b. *The Videotaped Confession Following Execution of the Written Rights Waiver Form*

■ Even if the oral warning had been defective, the confession following the written warning would still have been constitutionally sufficient. This is the lesson of *Oregon* v. *Elstad*, 105 S.Ct. 1285 (1985), where the Supreme Court considered the precise issue raised here by Poyner. There, defendant, while in a custodial setting, made an unwarned, inculpatory statement in response to a question from a police officer. One hour later, defendant was fully advised of his rights; he said he wished to make a statement. He confessed to the crime under investigation. There was no claim that the second confession was coerced under threats or promises. Defendant moved to suppress the second confession on the ground that it was the tainted fruit of the first confession. The Court rejected that argument stating as follows:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent

statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

105 S.Ct. 1293-94. The Court went on to hold that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." 105 S.Ct. 1298.

### 2. *Miranda Issue: The Hampton Case*

#### a. *Adequacy of the Warning*

Here, Poyner contends the oral *Miranda* warning was not "effective and express" but instead was "equivocal and ambiguous" because, in his view, the logical conclusion that a defendant would draw from the oral warning given here is that "he must wait until the Court can get an attorney appointed; which will be some time in the future." The gravamen of Poyner's attack, in the Hampton Case, is that he was not told he had the right to the immediate appointment of counsel. He argues on brief that "[t]he *Miranda* warning must effectively convey to the accused that he is *entitled to counsel immediately*. If the words are subject to the construction that such counsel will be available in the future, Miranda has not been obeyed." (Emphasis added.) Though this argument differs from that made in the Williamsburg Case, it is equally without merit.

█ *Miranda* nowhere requires that a suspect be told he has the right to the immediate appointment of counsel. Indeed, language in *Miranda* negates this very proposition:

> If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.
> *This does not mean, as some have suggested, that each police station must have a "station house lawyer" present at all times to advise prisoners.*

384 U.S. at 474 (emphasis added). It is a mistake to read *Miranda* to mean that a suspect has the right to the immediate appointment of counsel. The import of *Miranda* is that once a suspect asks for counsel, the police cannot interrogate him until counsel has been appointed. This is an important distinction which Poyner has not grasped. The mere fact that the oral warning given

to Poyner did not advise him of the right to have counsel appointed immediately, does not render the warning defective. *See United States* v. *Contreras*, 667 F.2d 976 (11th Cir. 1982); *Wright* v. *State*, 483 F.2d 405 (4th Cir. 1973), *cert. denied*, 415 U.S. 936 (1974); *State* v. *Maluia*, 56 Hawaii 428, 539 P.2d 1200 (1975); *Emler* v. *State*, 259 Ind. 241, 286 N.E.2d 408 (1972).

In support of the argument that he should have been told he had a right to the immediate appointment of counsel, defendant relies upon *United States ex rel. Williams* v. *Twomey*, 467 F.2d 1248 (7th Cir. 1972), and *Lathers* v. *United States*, 396 F.2d 524 (5th Cir. 1968). Those cases appear to stand for the proposition for which they are cited by Poyner. However, in our opinion, they are at odds with the spirit and letter of *Miranda* and thus are not persuasive.

### b. *Whether Defendant Requested Counsel*

In the Hampton Case, defendant makes the additional argument that he requested counsel but that his request was not scrupulously honored. This argument is based on Poyner's misunderstanding the facts.

According to defendant, after he received his oral *Miranda* warning he asked the detectives, "Do I have a right to an attorney?" Then, according to defendant, the officers began to stand up but paused to inform Poyner that they knew about his involvement in the Hedrick murder because Poyner "had been seen in the 600 block of 25th Street in reference to some candy." At that point, according to Poyner he said, "Let me tell you about the car."

The actual facts are different. After the oral *Miranda* warning, the officers summarized the information linking Poyner to the Hedrick murder. After the information had been summarized Poyner asked, "Didn't you say I have the right to an attorney?" The officers said, "Yes." They then made a motion to stand up. At that point Poyner spontaneously said, "Let me tell you about the car."

Poyner's statement was not a request for counsel. *See Bunch* v. *Commonwealth*, 225 Va. 423, 430, 304 S.E.2d 271, 275, *cert. denied*, 464 U.S. 977 (1983). At most, it sought to clarify one of the rights of which he had already been advised. The detectives did all they were required to do when they reaffirmed defendant's right to counsel by answering "yes" to his question.

In addition, even if Poyner's question could be interpreted as a request for counsel, his confession would still be valid. This is so because it was Poyner who initiated further communication with the detectives. *See Edwards* v. *Arizona*, 451 U.S. 477, 484-85 (1981).

### 3. *Miranda Issue: The Newport News Case*

In the Newport News Case, Poyner makes three arguments concerning the confession which followed the oral *Miranda* warning. First, he says the warning was defective because he was not advised of his right to have a lawyer appointed prior to questioning. This identical argument was made in the Williamsburg Case. For the reasons stated above it must be rejected.

Second, Poyner argues that he invoked his right to counsel but his request for counsel was not honored. This same argument was made and rejected in the Hampton Case. For the reasons stated above we find no merit in this argument.

Third, Poyner contends, in essence, that his will was overborne and that, as a result, his confession was not voluntary. We disagree. The basis for this contention is that Poyner did not want the detectives to tape or write down his initial confession and that he was in custody twelve days without any representation on the charge of murdering Ripple. The facts pointed to by Poyner fall far short of establishing that his will was overborne. *See Rodgers* v. *Commonwealth*, 227 Va. 605, 318 S.E.2d 298 (1984). Poyner's confession was voluntary.

### C. *Sufficiency of the Search Warrant*

### 1. *Description of Place to be Searched*

Poyner rented a room in a private home. The police searched that room pursuant to a warrant which gave the address of the house. In the Williamsburg and Hampton cases, Poyner contended that the search warrant was defective in that it did not describe with particularity the place to be searched. In both cases, Poyner argued that the warrant should have been directed at his room in the house and not at the house. This argument is without merit.

The evidence in both cases established that though Poyner rented a room he had the "run of the house." He routinely used both entrances to the house. The house had one bathroom, one

kitchen, and one living room, all of which were open to Poyner's use.

█ Poyner relies upon *Brown and Larson* v. *Commonwealth*, 212 Va. 672, 187 S.E.2d 160 (1972), and *Manley* v. *Commonwealth*, 211 Va. 146, 176 S.E.2d 309 (1970), *cert. denied*, 403 U.S. 936 (1971). Those cases stand for the proposition that where a search warrant is directed to a multiple occupancy structure, it must "describe the particular sub-unit to be searched." 211 Va. at 151, 176 S.E.2d at 314. Those cases have no application here. Poyner did not live in a sub-unit within a multiple occupancy structure. He lived in a private home.

### 2. *Basis for the Search Warrant*

In the Newport News Case, Poyner attacked the search warrant on the ground that it was issued based on his initial confession. He submits that since, in his view, his confession should have been suppressed the search warrant based on that confession should have been quashed. This argument must fail because, as stated above, the confession was proper.

### D. *Sufficiency of the Arrest Warrant*

In the Newport News Case, Poyner attacked his arrest warrant on the ground that it was issued based on his initial confession. His argument on this point parallels that made in the Newport News Case concerning the search warrant. This argument must fail for the same reason: the confession was proper.

### E. *Motion for Continuance*

█ In the Williamsburg Case, on the day of trial, Poyner moved for a continuance on the ground that certain inmates on death row in Virginia had recently escaped from prison. Poyner argued that the publicity surrounding the escape "created an atmosphere unfair to the rights of Poyner."

The trial court denied the motion. However, the court advised counsel that it would examine the jurors to determine whether they could hear the case without being influenced by the escape. In addition, the court offered to instruct the jurors on the need to consider the case without being influenced by the escape. As Poyner acknowledges, the decision to grant or deny a continuance lies in the sound discretion of the court and will not be reversed on

appeal absent an abuse of that discretion. *Gilchrist* v. *Commonwealth*, 227 Va. 540, 545, 317 S.E.2d 784, 787 (1984); *Van Sant* v. *Commonwealth*, 224 Va. 269, 275, 295 S.E.2d 883, 887 (1982). Here, we find no abuse of discretion.

## F. *Proceedings on Voir Dire*

In the Williamsburg and Newport News cases, Poyner raises several questions concerning the examination of prospective jurors regarding their views on the death penalty and the exclusion of certain jurors because of their views. Poyner contends that the jury in the Williamsburg Case was unconstitutional in its makeup. We disagree. We address each of Poyner's contentions below.

### 1. *Questions Regarding Views on the Death Penalty*

Poyner submits that asking prospective jurors their views on the death penalty and then excluding those opposed to the death penalty violates his constitutional rights because such a procedure results in an unrepresentative jury that is biased in favor of conviction. We disagree.

In *Waye* v. *Commonwealth*, 219 Va. 683, 690-91, 251 S.E.2d 202, 207, *cert. denied*, 442 U.S. 924 (1979), defendant argued that the use of "death qualifications" questions was improper because it resulted in an unrepresentative jury biased in favor of the Commonwealth. We rejected defendant's argument on the ground that since *Witherspoon* v. *Illinois*, 391 U.S. 510 (1968), permitted the exclusion of a juror opposed to the imposition of the death penalty, it could not be "constitutional error to inquire into his beliefs concerning capital punishment." 219 Va. at 691, 251 S.E.2d at 207. We adhere to what we said in *Waye. See LeVasseur* v. *Commonwealth*, 225 Va. 564, 576, 304 S.E.2d 644, 650 (1983), *cert. denied*, 464 U.S. 1063 (1984).

In addition to what we said in *Waye*, we reject Poyner's bias argument for yet another reason. The so-called death-qualified jury is merely a jury which can and will apply the law as set forth in the court's instructions — even if the death penalty may ultimately result. The jury Poyner would have the court empanel would contain members who would not obey the law as set forth in the court's instructions. Poyner contends the first jury is biased while suggesting that the second jury is not. We disagree. We think the biased jury is the one which includes members whose

views against capital punishment are such that in order to guard against the imposition of a death sentence they would disregard the law. Poyner, in essence, seeks a jury comprised of members most likely to find him not guilty. He has no due process right to such a jury. *See Briley* v. *Booker*, 746 F.2d 225 (4th Cir. 1984); *Keeten* v. *Garrison*, 742 F.2d 129 (4th Cir. 1984). *But see Grigsby* v. *Mabry*, No. 83-2113 (8th Cir. Jan. 30, 1985) (en banc).

We also reject Poyner's claim that the exclusion of jurors opposed to the death penalty results in an unrepresentative jury, in violation of the Sixth Amendment. The Commonwealth has the right to insist "that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court." *Adams* v. *Texas*, 448 U.S. 38, 45 (1980). A juror opposed to the imposition of the death penalty is not impartial. This is so because he or she would be unwilling or unable to follow the law. Such a juror might attempt to undermine the proper functioning of the courts by engaging in jury nullification. Thus, such a juror can be excluded from a jury panel without violating the defendant's right to a fair and impartial jury. *See Briley*, 746 F.2d at 226-27; *Keeten*, 742 F.2d at 133-34.

### 2. Obligation of Trial Court to Ask Questions Proposed by Counsel

In the Williamsburg Case, prior to voir dire, Poyner submitted the following question to be propounded to the members of the venire: "Do you think the evidence once you hear it, will probably show the defendant guilty?" According to defendant, this question was designed "to test a juror's potential feeling that an accused is probably guilty merely because he is on trial." Defendant argued, without citation to authority, that the disallowance of this question, "coupled with the Court's approval of death qualification questions . . . could well have resulted in a jury tainted in two ways against Poyner," that is, in favor of conviction and in favor of the death penalty.

The court refused to ask the question proposed by defendant. It gave two reasons for its decision. First, the court said because of the way the question was phrased a juror could answer "yes" and still be totally impartial. As a result, in the court's view, the question would not help purge the jury of only those persons with a fixed opinion of the defendant's guilt or innocence. Second, the court was concerned that the question would require a juror to

speculate on what evidence would be presented. The court suggested an alternative question: "Have you formed an opinion as to the guilt or innocence of the accused even though you have not heard the evidence in the case?"

In *LeVasseur*, the trial court would not permit defendant's counsel to ask a certain question on voir dire. Defendant complained that he had a right to ask the question the way he wanted it asked. We rejected that argument and wrote as follows:

> A party has no right, statutory or otherwise, to propound any question he wishes . . . . The court must afford a party a full and fair opportunity to ascertain whether prospective jurors "stand indifferent in the cause," but the trial judge retains the discretion to determine when the parties have had sufficient opportunity to do so.

225 Va. at 581, 304 S.E.2d at 653. Here, we find no abuse of the discretion vested in the court. Defendant's arguments regarding a possible taint resulting from not being allowed to ask the question he proposed are speculative and conclusory. The reasons given by the court for rejecting defendant's question, as phrased, are well-founded. Further, here, as in *LeVasseur*, the question proposed by the court was sufficient to preserve defendant's right to a fair trial by an impartial jury.

### 3. *Exclusion of Jurors Opposed to the Death Penalty*

In the Williamsburg Case, without identifying which jurors were improperly excluded, defendant makes the general statement that "[t]he record in this case indicates that several jurors were excused for cause because of similar answers." The "similar answers" language refers to cases cited by defendant wherein the juror's opposition to the death penalty was described as not being "unequivocal."

The record reveals that, at trial, defendant objected to the court's excusing two jurors. However, as the Commonwealth points out, the basis for those objections was defendant's general opposition to death-qualification voir dire questions — an argument considered and rejected above. Defendant did not object on the ground that the answers given by the two jurors did not meet the *Witherspoon* standard for excluding a juror for cause. (See *Wainwright* v. *Witt*, 105 S.Ct. 844 (1985), for the Supreme

Court's most recent discussion of the test for excluding jurors for cause in capital murder cases.) As a result, the issue defendant now attempts to raise is not cognizable on this appeal. Rule 5:21.

## III. *Trial Matters and Statutory Review*

### A. *The Williamsburg Case*

In this case, Poyner was tried before a jury on two charges of capital murder in the commission of robbery while armed with a deadly weapon. Code § 18.2-31(d). In the guilt phase of his bifurcated trial, he was convicted of the capital murders of Clara Paulette and Chestine Brooks. In the penalty phase, he received two separate death sentences for the murders.

### 1. *The Guilt Phase*

During the guilt phase of the trial, the Commonwealth introduced into evidence an edited version of his videotaped confession, the portion concerning the murders of Paulette and Brooks. In the videotape, Poyner stated that on the morning of January 30, 1984, he awoke early and walked around until he stole a car in Hampton. He then drove to Williamsburg and "on impulse" stopped at the Raleigh Motel. He entered the motel and encountered an "elderly Caucasian woman." He pointed a gun at her and told her he wanted her money. The woman, Clara Paulette, said that he had "caught her at a bad time." Nevertheless, in Poyner's words, she gave him "what she had." The amount taken was approximately $40.00.

While the armed robbery of Paulette was in progress, Chestine Brooks walked into an adjacent room, saw what was going on, retreated to a small kitchen area, and sat down and bowed her head in full view of Poyner. Once Poyner had Paulette's money he made Paulette and Brooks stand with their backs to him facing a kitchen counter. Neither woman resisted. Neither screamed nor tried to attract attention. Both did exactly as they were instructed. Though nothing impeded defendant's getaway, he shot both women in the back of the head with a .38-caliber pistol. After they slumped over dying, he left. He stated that he chose women as his victims because when women see guns they become frightened and therefore robbing women was less of a "hassle."

Other evidence presented by the Commonwealth established that a .38-caliber pistol was found in a search of Poyner's room. Further, the bullets removed from the bodies of Paulette and Brooks were determined to have been fired from that gun.

### a. *Admissibility of Photographs*

Defendant contends it was error for the trial court to admit into evidence, in the guilt phase of the case, certain pictures of the victim Clara Louise Paulette. Defendant objected to Commonwealth's Exhibits 5 and 6, claiming that they were inflammatory, prejudicial, and unnecessary. Exhibit 5 was a photograph of Paulette taken on the date of the autopsy. It showed her fully clothed, face up on a table. Exhibit 6 showed the wound in the back of Paulette's head.

The trial court ruled that the photographs were admissible because they did the following:

1. showed decedent's face so it could be established that the decedent was the person to whom the several witnesses referred;

2. showed that the wound was precisely located in the back of the victim's head and that the wound was the result of an aiming and shooting; and

3. showed the location of the wound in the back of the head thus corroborating defendant's testimony that he shot the victim in the back of the head.

Defendant objects to the photographs on the ground that their prejudicial effect outweighed their probative value.

The admission of photographs is a matter resting within the sound discretion of the trial court, whose ruling will not be disturbed absent a clear abuse of discretion. *See Stockton* v. *Commonwealth*, 227 Va. 124, 144, 314 S.E.2d 371, 384, *cert. denied*, 105 S.Ct. 229 (1984), and the cases cited therein. We have reviewed the photographs and considered the court's reasons for admitting them. We find no abuse of discretion regarding their admission into evidence.

### b. *Motion to Strike*

Defendant assigned error to the trial court's failure to grant his motion to strike at the conclusion of the Commonwealth's case. However, this issue was neither briefed nor argued. We will not consider it further.

### 2. *The Penalty Phase*

### a. *Introduction of Prior Unadjudicated Criminal Activity*

During the penalty phase, the trial court permitted the Commonwealth to introduce into evidence the unedited version of Poyner's videotaped confession in which he confessed to murdering five women including Paulette and Brooks. Defendant says this was error. Defendant contends this evidence was "irrelevant, unreliable and most [importantly] prejudicial." Defendant argues that he was, in effect, being tried in the Williamsburg Case for unrelated crimes.

In oral argument, defendant admitted that the statute does not limit proof, at the penalty phase, to the prior record of convictions. Nevertheless, he contends the evidence of unadjudicated criminal activity is unreliable and should not be used. We disagree.

In *Peterson v. Commonwealth*, 225 Va. 289, 302 S.E.2d 520, *cert. denied*, 464 U.S. 865 (1983), we said that pursuant to Code § 19.2-264.4, "more than the mere police record of the defendant may be introduced" during the penalty phase of the case. *Id.* at 298, 302 S.E.2d at 526. We specifically stated that "[t]he statute does not restrict the admissible evidence to the record of convictions." *Id.*, 302 S.E.2d at 526.

Here, defendant's confession to five murders was highly reliable and wholly relevant to the issue of future dangerousness. There was no error in admitting the full videotape into evidence.

### b. *Testimony Regarding the Possibility of Parole*

During the penalty phase, defendant called the Chairman of the Virginia Parole Board to testify concerning defendant's parole eligibility. The court would not permit the testimony. Defendant says this was error. We disagree.

The jury had no right to know what might happen to defendant, in terms of parole eligibility, after sentencing. During the

penalty phase it was the jury's duty to assess the penalty, irrespective of considerations of parole. *See Peterson*, 225 Va. at 296-97, 302 S.E.2d at 525; *Hinton* v. *Commonwealth*, 219 Va. 492, 495, 247 S.E.2d 704, 706 (1978).

### 3. *Statutory Issues*

### a. *Facts Adduced at Penalty Stage*

In order for the Court to make its independent assessment of the propriety of the two death sentences imposed in the Williamsburg Case, it is well to consider the facts adduced at the penalty stage.

The evidence established that on January 23, 1984, defendant stole a car and drove aimlessly around. "[O]n impulse" he decided to enter a beauty salon in a small shopping center in Hampton, in broad daylight, near noon. He walked in and a woman, Joyce Baldwin, came from the back of the store talking amicably to him about the hair care products she sold and what could be done with defendant if he took care of his hair. Defendant responded by pulling a gun on Baldwin and telling her that he wanted her money. He said that the woman "jumped," that "[s]he looked like she wanted to cry," and that "[s]he was real scared." He admitted that the woman, though frightened, did as she had been told and put money from the cash register into a bag. He ordered the woman to walk to the back of the store. He said she cried and begged him not to kill her. He shot her in the back of the head from a distance of four to six feet. He said he got "about $40, $50, $60 probably."

On January 30, 1984, he killed Paulette and Brooks in Williamsburg. His pattern was similar to that used a week earlier in killing Baldwin: he stole a car and drove around until, on "impulse," he selected a target. He committed his crime in broad daylight near noon. The victims were women who did just as he ordered. He shot both women in the back of the head after taking "$30, $40, $50."

On January 31, 1984, he killed again. The victim was a lone female clerk in a High's Ice Cream store in Newport News. That morning he stole a car and drove around. He spotted Vicki Ripple alone in the store near noon. On "impulse" he decided to rob the store. He did not know the victim and did not recall ever having been to that store before. He walked in, pointed a gun at the teen-

aged attendant and demanded money. He said, "She jumped." He said further that "[s]he was scared at first, but she reached over and got the bag and filled it up." The victim, after complying with all defendant's demands, then walked into a corner and covered her head with her arms, in essence cowering in a corner in fear for her life. Poyner shot her in the head. He got "$20, $30, $35 probably."

On February 2, 1984, Poyner was in Hampton. Sometime before noon, he saw Carolyn Hedrick walk out of a store and approach her car. He walked up to her with a gun in his hand and said, "I want your money and get in the car." He said, "[S]he screamed. She was nervous. And she got in. So I drove a block from there." Once in the car he made his victim disrobe to prevent her from escaping. She cried and begged for her life. He said he stopped near a telephone pole in Hampton and shot her in the left side of the head. He then drove into Newport News and dumped her nude body behind a church in a parking lot. He said he shot her so she could not identify him. He observed that the victim had boxes of candy in her car. He drove around, in the victim's car, selling her candy to some and giving it to others. He got "$20, $30, $40 probably."

Poyner called several witnesses in mitigation. Poyner's father testified that defendant's mother had died three years before the murders. He testified further that he left Poyner when Poyner was three years old and, except for two brief visits, did not see Poyner again until after the murders.

Poyner's half brother testified that defendant had been "a little energetic" as a child, that defendant had gotten into trouble as a youth, that defendant's mother had trouble with defendant's taking things, but that he had never observed defendant commit acts of violence.

A psychiatrist who had examined defendant in 1974, ten years before the murders, said he was not aware of any history of violent behavior.

Another witness, a juvenile corrections officer, said that while defendant was incarcerated in 1970 and 1972, there was no history of violent behavior, and that defendant adjusted satisfactorily.

A professional bondsman, who had posted bond for Poyner in the past, testified that Poyner's mother had asked him, the bondsman, to have talks with Poyner to urge him to stay "straight."

The witness said he talked to defendant once each month until Poyner's mother died, at which point Poyner stopped coming to visit. The witness said that from 1972 to 1978 he did not notice any violent behavior on the part of Poyner.

A parole officer who had worked with Poyner for two months as a result of two breaking and entering charges was asked whether defendant had a history of violent behavior. The witness referred to his records and said, "The only charges that our records show are in '76, March of '76, he received a charge of assault on an officer [for] which he received six months in the city prison farm." The witness said his records also revealed instances of petty larceny, tampering with autos, and resisting arrest.

Poyner also called as a witness, Dr. James C. Dimitris, a forensic psychiatrist at Central State Hospital in Petersburg, Virginia. Dr. Dimitris examined defendant on several occasions subsequent to defendant's arrest for the 1984 murders. He said defendant suffered from a "mixture of passive and aggressive personality, with some characteristics of antisocial behavior." The witness said defendant did not commit any acts of violence while at Central State.

On direct examination, Dr. Dimitris was asked for an opinion whether defendant would be dangerous in the future. He responded: "I don't know. He has the ability to control the impulses if he so wishes." He testified further, again on direct examination, that the test showed defendant did not meet the "criteria of insanity." He said too that the Commonwealth has facilities to treat people "who are motivated to change themselves."

On cross-examination Dr. Dimitris testified that defendant had no diagnosis of psychosis. He went on to say that based on his examination, defendant knew right from wrong at the time of the murders. According to Dr. Dimitris, defendant knew the nature and consequences of his acts; he was not feebleminded; he had no organic dysfunction; he had no mental defects; he had no mental disease; and his thinking was not so distorted that he did not know right from wrong.

On redirect, the witness added, however, that defendant's thinking was distorted to the extent that defendant "didn't have love for the people any more, the people that were killed."

A clinical social worker who interviewed defendant when he was brought to Central State testified that based on her interview she identified three problem areas in defendant's life: 1. family

relation difficulties, 2. difficulties associated with the death of his mother, and 3. marital difficulties.

Defendant's wife testified that while they were together they had a normal relationship. She said if they argued it "wasn't nothing like violent, nothing like that." She said when he went off to serve jail time she saw other men and told him she "had other friends." She said, "[H]e didn't have no reaction no more than said . . . he didn't want nothing to happen to me."

A classification supervisor with the Newport News Sheriff's department said she had known defendant since 1977, and that she had been his educational instructor at the jail. She said Poyner was "very quiet" and that he had a hard time in his studies. She said that when she was working with him, defendant tested at the fourth grade level. She said he had not caused any trouble in jail while she was there.

The jury returned two separate death sentences, both based on future dangerousness. The court ordered a presentence report, as required by law. After consideration of the report the court entered judgment on the sentences of death.

### b. *Passion, Prejudice, Arbitrariness*

■ Defendant refers to the "possibility" that the jury's determination was clouded by "passion and prejudice." However, he points to nothing in the record that would support the suggested possibility of passion and prejudice. Upon our independent review of the record, we find no evidence that the death sentence in this case was imposed on the basis of passion, prejudice, or arbitrariness.

### c. *Excessiveness and Disproportionality*

■ Nor are the death penalties in the Williamsburg Case excessive or disproportionate. Poyner's actions graphically illustrated the probability that he would "commit criminal acts of violence that would constitute a continuing serious threat to society." Code § 19.2-264.2. While he was on his crime spree, no lone female was safe. He struck boldly in the broad daylight because he knew he would kill his victim and there would be no witness to identify him. He selected his victims on impulse. He ignored pleas for mercy. He ignored cries of fear and anguish. Even as he described his criminal acts on videotape he showed no remorse. In each case

he could have accomplished his armed robbery without killing but he killed anyway. He killed execution style, at point-blank range, with shots to the head. He preyed on women because he thought they would not resist and even though they did not resist he took their lives.

Though defendant contends the death penalties in the Williamsburg Case are excessive and disproportionate, he cites no cases in support of that position. Even so, we have accumulated and considered the records of all the capital murder cases reviewed by this Court whether a sentence of death was imposed or not. We have placed particular emphasis upon cases involving capital murder in the commission of robbery while armed with a deadly weapon where the basis for the death penalty was future dangerousness. It is our conclusion that juries in Virginia customarily impose the death sentence for conduct similar to defendant's. *See, e.g., Peterson* v. *Commonwealth*, 225 Va. 289, 302 S.E.2d 520, *cert. denied*, 464 U.S. 865 (1983) (capital murder/robbery; victim shot once in abdomen; death penalty based on future dangerousness); *Quintana* v. *Commonwealth*, 224 Va. 127, 295 S.E.2d 643 (1982), *cert. denied*, 460 U.S. 1029 (1983) (capital murder/robbery; victim killed by multiple hammer blows to her head, neck, and back; death penalty based on vileness and future dangerousness); *Clanton* v. *Commonwealth*, 223 Va. 41, 286 S.E.2d 172 (1982) (capital murder/robbery; victim strangled with belt; death penalty based on vileness and future dangerousness); *Bassett* v. *Commonwealth*, 222 Va. 844, 284 S.E.2d 844 (1981), *cert. denied*, 456 U.S. 938 (1982) (capital murder/robbery; victim shot six times in back, arm, and lip; four shots were fired within inches of the victim; death penalty based on future dangerousness); *Turner* v. *Commonwealth*, 221 Va. 513, 273 S.E.2d 36 (1980), *cert. denied*, 451 U.S. 1011 (1981) (capital murder/robbery; victim died from gunshot wounds to chest; death penalty based on vileness and future dangerousness).

Based on all the facts and circumstances of the Williamsburg Case, we find no error either in the convictions or in the sentences.

## B. *The Hampton Case*

In this case, Poyner was tried by the court sitting without a jury for the capital murders of Joyce Baldwin and Carolyn Hedrick in the commission of robbery while armed with a deadly weapon. He was also charged, among other things, with raping Hedrick. The

evidence in the guilt phase of the trial was stipulated by counsel. The trial court found defendant guilty as charged.

At the end of the penalty phase of the trial, he was sentenced to death on the grounds that the murders of Baldwin and Hedrick were vile and because he was determined to pose a future danger to society. He contends, on appeal, that the Commonwealth failed to prove, beyond a reasonable doubt, that the murders were vile or that he would be dangerous in the future. We disagree.

### 1. *The Statute*

Before the death penalty can be imposed, the Commonwealth must prove beyond a reasonable doubt either

> that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society or that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim. . . .

Code § 19.2-264.2. The first part of the statute is sometimes referred to as the future dangerousness predicate while the second part is sometimes referred to as the vileness predicate.

### 2. *Vileness: Proof of Depravity of Mind*

The trial court found that the two murders were vile in that they involved both aggravated battery and depravity of mind. Of course, under the statute, proof of both is not required to establish vileness.

On appeal, the Attorney General conceded that neither murder involved an aggravated battery. He argued, however, that the finding of vileness must still be upheld on the basis of the "depravity of mind" alternative of the vileness predicate. According to the Attorney General, psychological torture reflects depravity of mind. And, he submits, the victims of these two murders were subjected to psychological torture before they were killed.

We have not heretofore decided whether depravity of mind can be established upon proof of psychological torture. However, in *Stamper v. Commonwealth*, 220 Va. 260, 282-83, 257 S.E.2d 808,

823-24 (1979), *cert. denied*, 445 U.S. 972 (1980), we discussed mental torture: We said "[T]here was no direct evidence of torture or aggravated battery in the commission of those crimes, although mental torture might reasonably be inferred from what could be characterized as execution-type murders." In essence, *in Stamper*, we acknowledged the existence of psychological torture.

■ In support of its psychological torture argument, the Attorney General cites *Burger* v. *Zant*, 718 F.2d 979, 987 (11th Cir. 1983), *vacated on other grounds*, 104 S.Ct. 2652 (1984), where the court held as follows:

> [A] death sentence may constitutionally be imposed . . . based on a finding that the defendant inflicted either psychological or physical torture upon his victim. We can discern no principled basis for attempting to distinguish the two . . . .

In *Smith* v. *Commonwealth*, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), *cert. denied*, 441 U.S. 967 (1979), we defined depravity of mind as "a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation." We think that psychological torture falls squarely within the foregoing definition. Therefore, we hold that depravity of mind, an aspect of the vileness predicate, can be established by proof of psychological torture.

Defendant argues that neither of these murders involves vileness because the victims died instantly. He cites *Godfrey* v. *Georgia*, 446 U.S. 420 (1980). However, as the succeeding sections will establish, the facts here and those in *Godfrey* are not the same. See *Turner* v. *Bass*, 753 F.2d 342 (4th Cir. 1985), for a discussion of instantaneous death and the vileness predicate.

### a. Vileness: The Baldwin Murder

On the day Poyner killed Baldwin, he was driving aimlessly around when he came upon the small shopping center in which Baldwin's hair salon was located. On "impulse" he pulled up to the salon and walked in. Baldwin came from the back of the shop talking amicably to Poyner. She talked about her hair care products and what they could do for Poyner if he took care of his hair.

At some point as she talked she turned away from Poyner; when she turned to face him again a .38 caliber pistol was pointed at her. Poyner told her he wanted her money. According to him,

"she jumped. She looked like she wanted to cry. She was real scared. So she put the money in the bag . . . ."

After she had done what he wanted, he made her turn her back to him and walk away. All the while, she cried and begged him not to kill her.

The record does not reveal how long Poyner was in the store with the gun pointed at Baldwin. Poyner is the only living witness. The record does show, however, that Baldwin had time to realize Poyner's deadly purpose and to peer down the barrel of a .38-caliber pistol in the hands of a person who had let her get a good look at his face. She had time to realize that since she could identify him she was a potential threat to him.

After Baldwin had turned over the money, he made her turn away and expose her back to his gun. He did not shoot her immediately; he let her, indeed ordered her to walk away from him, toying with her, implying that she might be spared. Then he shot her in the head.

 Poyner's conduct in shooting a defenseless woman in the back of the head, a woman begging for her life after she had complied with all his demands, showed a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation. He engaged in psychological torture of Baldwin. He made her know that her fate dangled from the end of his trigger finger. He killed her execution style for no reason other than to eliminate a witness. As we have said, even in recounting the killing in his videotaped confession he showed no remorse.

The killing in *Godfrey* v. *Georgia*, 446 U.S. 420 (1980), was nothing like the killing of Baldwin. In *Godfrey*, an estranged husband looked through a window into a trailer, saw his wife, and immediately shot her through the window. He then rushed inside, struck his daughter with the rifle, and shot his wife's mother. There, in that domestic conflict, the victims were not forced to function with a gun pointed at them, they did not have time to beg for their lives, they did not have time to cry. They were killed almost as soon as they were aware that they were in danger; not so with regard to Baldwin's death. The killing of Baldwin was vile.

### b. *Vileness: The Hedrick Murder*

Poyner killed Hedrick on February 2, 1984. He approached her as she walked to her car. He pointed a gun at her and forced her

to get inside the car. She screamed when he first approached her, but that did not dissuade Poyner, even though he was on a public street in broad daylight. He made Hedrick disrobe. He raped her. He shot her in the head. He pushed her nude body out of a car onto a parking lot behind a church. He then drove around in his victim's car selling and giving away candy he found in the back seat.

This conduct was vile. Only a depraved mind could conjure up such abuse. He terrified this woman. She did everything he demanded including disrobing in a car in the middle of the day. Throughout this ordeal, by his own admission, his victim cried and begged that her life be spared. He shot her anyway. Hedrick was executed. By Poyner's own admission, the only reason he shot her was to eliminate her as a witness. He engaged in psychological torture.

### 3. *Future Dangerousness*

Even if vileness had not been proved as to each murder, the death sentences would nonetheless be appropriate because the evidence proved Poyner's future dangerousness beyond a reasonable doubt. *See Zant* v. *Stephens*, 462 U.S. 862 (1983). A review of the evidence adduced during the penalty phase of the trial shows with clarity Poyner's future dangerousness.

Poyner's record of convictions prior to July 24, 1984, was entered into evidence. It contained nineteen convictions, starting in September 1974 and running through July 12, 1984. Early in his criminal career, in 1976, he was convicted of "Assault on Police Officer." His record showed three capital murder convictions, convictions for breaking and entering, for robbery, and for use of a firearm.

The Commonwealth called as a witness a man who had socialized with Poyner on several occasions near the time of the five murders. While with Poyner in the middle of January 1984, the witness noticed a brown-handled pistol inside Poyner's vest. On another occasion, the witness heard Poyner say that if he ever contracted a disease from a woman he would "kill them." The witness was with Poyner on February 3, 1984, as Poyner read a newspaper account of the Hedrick murder. The witness said Poyner described the article to people present and that he showed no emotion while doing so.

Another witness, a woman, testified that Poyner approached her in a shopping mall on January 16, 1984, near 10:30 in the morning, and grabbed her purse. When she resisted, Poyner pulled her to the ground, dragged her a few feet, broke her arm in two places, and escaped with her purse.

Detective Browning of the Hampton Police testified that he went to Poyner's house on February 1, 1984, in response to a telephone call from Poyner in which Poyner claimed to have information regarding the murder of Joyce Baldwin. Poyner admitted Browning into the house which Poyner shared with a Reverend Wilson. Poyner then told the officer that he had overheard a woman in a cafe tell her companion that she knew who killed Baldwin. Poyner could not identify either of the people who allegedly participated in this conversation. It is plain that Poyner was attempting to mislead the police in order to divert attention from himself.

The Commonwealth entered into evidence Poyner's entire videotaped confession. In the videotape, Poyner confessed to shooting five women in the head. Each victim did as he directed. At least two cried and begged not to be shot. All the victims were selected on "impulse." He victimized women because he thought he could frighten them with a gun. He thought it would be easier to rob a female. Detective Browning said that after Poyner finished making his videotaped confession Poyner told Browning that Poyner killed the women so they could not identify him.

Poyner put on evidence in mitigation. He called an official from the Department of Corrections who had processed him on two occasions when he served time in the system. The witness, an assistant superintendent for evaluation and classification, said that in 1970 and 1972, defendant was unsure of himself and "was showing some signs of being paranoid and/or schizophrenic." He said that defendant was referred to Eastern State Hospital but was not admitted as a patient.

Poyner also called Dr. James Dimitris, a forensic psychiatrist at Central State Hospital. Dr. Dimitris testified that defendant fit "the concept of mixed personality disorder with passive/aggressive and antisocial personality traits." Dr. Dimitris explained that a person with an antisocial personality is prone to stealing, vandalism, and destruction of property or life and does so "without making adjustments out of it in life later on or learn[ing] from the

previous experience [to] do better, but continues the same kind of self-centered, immature type of behavior."

Dr. Dimitris stated that Poyner's condition is treatable if there exists an "honest relationship" between the patient and a professional. The witness said that while Poyner was at Central State for twelve days he was one of the best patients in the unit. He said too that when Poyner killed, Poyner was taking out frustration against his wife or somebody else.

On cross-examination, Dr. Dimitris admitted that anybody willing to be treated is treatable. He also admitted that there is no guarantee of success even if a person is treated. With regard to Poyner's mental state, Dr. Dimitris testified that defendant's intelligence was in the dull-normal range; that at the time of the killings, defendant knew right from wrong and the consequences of his actions; that defendant suffered from no psychosis; that defendant had no deficiency of intellect and no brain damage. Dr. Dimitris also said that defendant robbed people to get money and killed them so they would not turn him in to the authorities.

We reject defendant's contention that the evidence did not establish future dangerousness. One significant error in defendant's argument is his claim that he had committed no acts of violence prior to January 1984. Yet, he assaulted a police officer in 1976. That is an act of violence indicating disdain for the law itself. Further, defendant apparently would have us forget that seven days before he killed Baldwin, he broke a woman's arm stealing her purse. And, that by the time of the Hedrick murder, he had already killed four times. Defendant claims there is no way to predict future criminal behavior. We disagree. After a long career of crime, defendant graduated to repeated acts of violence and relentless killing; we think the evidence is wholly sufficient to establish future dangerousness.

### 4. *Statutory Review*

#### a. *Passion, Prejudice, and Arbitrariness*

Our independent review of the record reveals nothing to suggest that the death penalties imposed in the Hampton Case were the result of passion, prejudice, or arbitrariness. The stipulated evidence concerning guilt was fully sufficient. The evidence during the penalty phase was, as previously demonstrated, ample. We

hold that the death penalties were not imposed arbitrarily or on the basis of passion or prejudice.

### b. *Excessiveness and Disproportionality*

■ Defendant contends that the death penalties are excessive and disproportionate in the Hampton Case because it would be better to imprison defendant for life. But whether defendant *could* be sentenced to life imprisonment is not the question; the question is whether the death penalty is customarily imposed in crimes of this kind. *Coppola* v. *Commonwealth*, 220 Va. 243, 258-59, 257 S.E.2d 797, 807-08 (1979), *cert. denied*, 444 U.S. 1103 (1980).

■ In arguing that the death penalty is excessive and disproportionate, defendant also contends that what he did to his victims is not as heinous as what was done to the victims in *Briley* v. *Commonwealth*, 221 Va. 563, 273 S.E.2d 57 (1980), and *Smith* v. *Commonwealth*, 219 Va. 455, 248 S.E.2d 135 (1978), *cert. denied*, 441 U.S. 967 (1979). But his reliance upon those cases is misplaced. Those were cases of aggravated battery. These are depraved-mind killings where the defendant has also been determined to pose a future danger to society. Just because the murder scenes created by Poyner may be less gruesome than those in *Briley* and *Smith*, it does not follow that this defendant is less culpable for his murders.

Defendant fails to cite any case which supports his argument of excessiveness and disproportionality. And, upon our review of the accumulated records of all death penalty cases considered by this Court, we find none. To the contrary, the cases show that the death penalty is customarily imposed in this type case. *See, e.g., Jones* v. *Commonwealth*, 228 Va. 427, 323 S.E.2d 554 (1984) (capital murder/robbery; one victim shot in face then set afire, death from smoke inhalation; other victim shot in face from a distance of less than a foot; death penalty based on vileness); *LeVasseur* v. *Commonwealth*, 225 Va. 564, 304 S.E.2d 644 (1983), *cert. denied*, 464 U.S. 1063, (1984) (capital murder/robbery; victim beaten and stabbed repeatedly; body found bound with evidence of attempt to burn body; death penalty based on vileness); *Bunch* v. *Commonwealth*, 225 Va. 423, 304 S.E.2d 271, *cert. denied*, 464 U.S. 977 (1983) (capital murder/robbery; victim shot and strangled; death from both causes; death penalty based on vileness); *Peterson* v. *Commonwealth*, 225 Va. 289, 302 S.E.2d 520, *cert. denied*, 464 U.S. 865 (1983) (capital murder/robbery; victim shot

once in abdomen; death penalty based on future dangerousness); *Quintana* v. *Commonwealth*, 224 Va. 127, 295 S.E.2d 643 (1982), *cert. denied*, 460 U.S. 1029 (1983) (capital murder/robbery; victim killed by multiple hammer blows to her head, neck, and back; death penalty based on vileness and future dangerousness); *Clanton* v. *Commonwealth*, 223 Va. 41, 286 S.E.2d 172 (1982) (capital murder/robbery; victim strangled with belt; death penalty based on vileness and future dangerousness); *Bassett* v. *Commonwealth*, 222 Va. 844, 284 S.E.2d 844 (1981), *cert. denied*, 456 U.S. 938 (1982) (capital murder/robbery; victim shot six times in back, arm, and lip; four shots were fired within inches of the victim; death penalty based on future dangerousness); *Turner* v. *Commonwealth*, 221 Va. 513, 273 S.E.2d 36 (1980), *cert. denied*, 451 U.S. 1011 (1981) (capital murder/robbery; victim died from gunshot wounds to chest; death penalty based on vileness and future dangerousness).

Based on all the facts and circumstances of the Hampton Case, we find no error either in the convictions or in the sentences.

## C. *The Newport News Case**

In this case, Poyner was tried before a jury on a charge of the capital murder of Vicki Ripple in the commission of robbery while armed with a deadly weapon. He was convicted of capital murder and sentenced to death on the ground that he posed a future danger to society.

### 1. *The Guilt Phase*

During the guilt phase of the trial, the portion of Poyner's videotaped confession concerning the Ripple murder was entered into evidence. Poyner confessed that sometime near noon on January 31, 1984, he was driving past a High's Ice Cream store in Newport News when he observed a lone female in the store. On "impulse" he decided to rob the store. He walked in, pointed his .38-caliber pistol at the seventeen-year-old clerk and demanded

---

*Among other things, defendant questions the jury verdict in the Newport News Case on the ground that it was contrary to the law and evidence. This assignment is defective. "An assignment of error which merely states that the judgment is contrary to the law and the evidence is not sufficient." Rule 5:21. We will not consider it further.

money. He said "[s]he jumped" and "was scared at first" but that she did his bidding and put money from the cash register into a paper bag. After she had done as Poyner directed, Ripple walked into a corner and covered her head with her arms. She did not attempt to run. She simply crouched in a corner in terror. Poyner shot her in the head. He chose Ripple as a victim because he thought women were less difficult to rob than men because they were afraid of guns. Poyner got "twenty, thirty, thirty-five dollars."

In other evidence, the Commonwealth established that the bullet which killed Ripple was fired from a gun found in a search of Poyner's room. The victim's body was not mutilated, nor had she been raped.

### a. *Question from Jury Re: Life Imprisonment*

At the end of the guilt phase of the trial, after the jury had retired, it returned to the courtroom and its foreman asked the court to define "life imprisonment." The court advised the jury that it should read the instructions already given to it. The court reminded the jury of its duty, upon a finding of guilty, to punish defendant in accordance with the law stated in the instructions. In short, the trial court adhered to our holding in *Hinton v. Commonwealth*, 219 Va. 492, 247 S.E.2d 704 (1978), that the jury has no right to be advised of post-sentencing events. Poyner claims the court's response was in error. We think it was precisely what the law required. There is no merit to this argument.

### b. *Motion to Strike*

Defendant questions the trial court's failure to strike the Commonwealth's evidence at the close of the case. We have recounted the evidence in this case. It is clear that this argument is without merit.

### c. *Sufficiency of Evidence of Capital Murder*

Defendant contends the evidence was insufficient to establish that the murder was committed during the commission of robbery while armed with a deadly weapon. The only argument advanced in support of this proposition is this sentence contained in

the brief: "The evidence in this case shows that the act of robbery was complete before the intent to commit murder was formed." The fact that defendant had the money in hand before he shot Ripple does not mean that he can escape a charge and conviction of capital murder; robbery is a continuing offense. *See Linwood Earl Briley* v. *Commonwealth*, 221 Va. 532, 273 S.E.2d 48 (1980), *cert. denied*, 451 U.S. 1031 (1981). The issue was whether the murder occurred "in the commission of robbery." Code § 18.2-31(d). There is ample evidence to support that conclusion. Without rehashing all the facts, we consider it pertinent that the victim had gotten a clear look at Poyner and thus could have identified him. Further, at the time she was killed she was huddled in a corner, covering her head with her arms. The jury could reasonably have concluded that Poyner killed Ripple to prevent her from calling for help and to keep her from identifying him as the robber.

## 2. The Penalty Phase

### a. Testimony Regarding Parole

Poyner complains that during the penalty phase the trial court erred in failing to grant Instruction I which provided: "In Virginia, any person convicted of three separate offenses of murder or armed robbery, when such offenses were not part of a common act, shall not be eligible for parole." He says further that the court erred in not allowing the Chairman of the Virginia Parole Board to testify concerning Poyner's parole eligibility. A virtually identical argument was made in the Williamsburg Case. What we said there applies with equal force here. The trial court correctly refused Instruction I and the testimony of the parole board official.

### b. Instructions Regarding Vileness and Mitigation

Defendant complains that the court erred in refusing to grant Instructions D, E, and G, and in failing to grant Instruction C in its original form. These instructions concern requirements for the imposition of the death penalty. The death penalty in this case was based on defendant's future dangerousness. The Commonwealth did not rely upon the vileness predicate of the statute.

■ Instruction C in its original form made reference to vileness as a basis for the imposition of the death penalty. In its amended form, those references were deleted. Instruction D also related to vileness; it defined "depravity in mind." Instruction E likewise related to vileness; it defined "aggravated battery." Since the death penalty in this case was not based on vileness, Instruction C in its unamended form and Instructions D and E related to matters not in issue. Therefore, the court properly amended Instruction C and properly refused Instructions D and E.

■ Defendant's proposed Instruction G provided as follows:

The law recognizes certain factors which the jury should take into account as factors which favor a life sentence. They are not excuses. The law will not excuse the accused's conduct, but will severely punish him by death or a life sentence. But there are reasons which the law recognizes as valid reasons for imposing a life, rather than death sentence.

The law, in its wisdom, provides the jury with a mechanism through which it can ferret out the cases in which death is deserved from those in which it is not. This mechanism is called mitigation.

At trial, the Commonwealth's Attorney objected to this instruction on the ground it was argumentative. Counsel for defendant advanced no argument in support of the instruction. The court refused the instruction on the ground it was argumentative. On appeal, neither on brief nor in oral argument did counsel advance a reason or cite authority in support of this instruction. We agree that it was argumentative, and we conclude that the trial court properly refused to grant it.

### c. *Permissible Evidence During Penalty Phase*

Defendant complains of the use, during the penalty phase of the Newport News Case, of photographs, videotaped confessions, and oral testimony of other capital murder charges against him. For the reasons stated in our discussion of the Williamsburg Case, we hold that this evidence was properly admitted in this case.

### 3. *Statutory Issues*

Turning now to a consideration of the factors that we must, by statute, consider, we find no evidence that the death penalty imposed in the Newport News Case was the product of passion or prejudice, or that it was arbitrarily imposed. Significantly, defendant does not suggest that passion, prejudice, or arbitrariness played any role in the imposition of this death sentence.

 Nor does our review of the record lead us to the conclusion that the imposition of the death penalty in a case such as this is either excessive or disproportionate to the penalties imposed in similar cases. The only thing defendant says on this point is that instead of considering only Virginia cases, we should consider cases from across the nation in determining excessiveness. Suffice it to say that defendant's suggestion is not the law. *See Coppola* v. *Commonwealth,* 220 Va. 243, 256, 257 S.E.2d 797, 806 (1979), *cert. denied,* 444 U.S. 1103 (1980).

In Virginia, in cases of this kind, juries customarily impose the death sentence. *See, e.g., Peterson* v. *Commonwealth,* 225 Va. 289, 302 S.E.2d 520, *cert. denied,* 464 U.S. 865 (1983) (capital murder/robbery; victim shot once in the abdomen; death penalty based on future dangerousness); *Quintana* v. *Commonwealth,* 224 Va. 127, 295 S.E.2d 643 (1982), *cert. denied,* 460 U.S. 1029 (1983) (capital murder/robbery; victim killed by multiple hammer blows to her head, neck, and back; death penalty based on vileness and future dangerousness); *Clanton* v. *Commonwealth,* 223 Va. 41, 286 S.E.2d 172 (1982) (capital murder/robbery; victim strangled with belt; death penalty based on vileness and future dangerousness); *Bassett* v. *Commonwealth,* 222 Va. 844, 284 S.E.2d 844 (1981), *cert. denied,* 456 U.S. 938 (1982) (capital murder/robbery; victim shot six times in back, arm, and lip; four shots were fired within inches of the victim; death penalty based on future dangerousness); *Turner* v. *Commonwealth,* 221 Va. 513, 273 S.E.2d 36 (1980), *cert. denied,* 451 U.S. 1011 (1981) (capital murder/robbery; victim died from gunshot wounds to chest; death penalty based on vileness and future dangerousness).

Based on all the facts and circumstances of the Newport News Case, we find no error either in the conviction or in the sentence.

## IV. *Conclusion*

The five death sentences entered in the three cases will all be affirmed.

Record No. 841434—*Affirmed.*
Record No. 841435—*Affirmed.*
Record No. 841539—*Affirmed.*
Record No. 841540—*Affirmed.*
Record No. 841589—*Affirmed.*